## Case No. 14,832.

### UNITED STATES v. COLE et al.

[5 McLean, 513.] 1

Circuit Court, D. Ohio.   Oct. Term, 1853.

CONSPIRACY TO DESTROY VESSEL—EVIDENCE—ACTS DONE—DESTRUCTION OF VESSEL—WITNESSES —GUILT—REASONABLE DOUBT.

1. The 23d section of the act of congress of the 3d of March, 1825 [4 Stat. 122], which punishes a conspiracy to destroy a vessel or cargo, with the intent to defraud the underwriters is constitutional.

2. The object of the act is, to protect commerce, and the protection to underwriters is incidental.

3. The act applies to our internal as well as to our foreign commerce.

4. The mischief is as great in the one case as in the other.

5. And the opportunities to commit the offense, are much greater in our internal, than in our foreign commerce.

6. This congress has as full power to do, for the protection of commerce among the several states, as for the protection of commerce with foreign nations.

7. After prima facie evidence has been given of a conspiracy, the statements of those implicated, though not included in the indictment, is evidence.

[Cited in Cuyler v. McCartney, 40 N. Y. 244.]

8. This is, on the principle, that where a combination of individuals has been formed, to commit an unlawful act, they have assumed an individuality in doing the wrong, and the conduct of each one in doing or promoting the act, is chargeable on the whole.

[Cited in People v. Marble, 38 Mich. 130; Spies v. People, 122 Ill. 230, 12 N. E. 976, and 17 N. E. 898.]

9. The burning of the vessel is not necessary to complete the offense.

10. Any combination of two or more persons to destroy the vessel or cargo, consummates the offense under the law, though neither the vessel nor the cargo is injured.

11. The act strikes at the incipient stages of the crime.

12. In its object it is preventive, by punishing the design to do the act.

13. Circumstantial evidence may be as satisfactory to a jury as positive.   Sometimes it may equal positive proof.

14. The destruction of the vessel by the defendants, or by any one of them, identified with the defendants as conspirators, would be conclusive against them.

[Cited in People v. Richards, 67 Cal. 415, 7 Pac. 830.]

15. The burning of the vessel is not punishable under the act of congress, but it operates as evidence, against the defendants.

16. The testimony to show the unlawful combination does not end at the destruction of the boat.

17. After, as well as before that event, the acts of the confederates may be examined to show their guilt.

18. Their entire acts, in relation to the subject matter of the indictment, which conduce to show a guilty purpose, may be proved.

19. The jury are the exclusive judges of the credibility of witnesses

1 [Reported by Hon. John McLean, Circuit Justice.]

20. The manner in which a witness testified, the opportunity he had of knowing the facts he swears to, and his whole deportment in making his statements, will necessarily have an effect with the jury, in giving or withholding their confidence in his statements.

21. In coming to a conclusion of guilty or not guilty, the jury will weigh the evidence and exercise their best and most deliberate judgment.

22. They will not convict unless their minds are clearly convinced of the guilt of the accused.

23. But if so convinced, they will not be deterred from a conviction of the defendants, in whole or in part, as the evidence may require, from the consequences which may follow.

24. We have, in this trial, only to look at the facts and the law.   With consequences we have nothing to do.

25. But if the jury are not satisfied of the guilt of the defendants, beyond reasonable doubts, an acquittal should follow.

[This was an indictment against Lyman Cole, William Kissane, John N. Cummings, George P. Stephens, William H. Holland, Benjamin W. Kimball, James W. Chandler, James G. Nicholson, Adams Chapin, Amasa Chapin, Rufus Chapin, and Lorenzo Chapin charging them and one Lucius L. Filley, deceased, with entering into a combination and conspiracy to burn the steamer Martha Washington, and with afterwards setting on fire and burning said boat. Heard first upon motion to quash indictment, afterwards upon trial and charge to jury.]

Mr. Stanbery, Mr. Morton, U. S. Dist. Atty., and Mr. Ware, for the Government.

Ewing, Walker, Swayne, Pendleton & Ward, for defendants.

OPINION OF THE COURT. Before the jury were called, a motion was made by the defendants' counsel to quash the indictment. The main ground upon which the motion to quash was urged was, that the act under which the indictment was found, applied, exclusively to offenses committed on the high seas, and not on our rivers and lakes. It was also urged that the act was unconstitutional, if it was intended to apply to our internal commerce. These points were argued elaborately, on both sides, and with ability.

In deciding the motion, McLEAN, Circuit Justice, said, that the court would proceed to give its impression upon the case, which had been so ably argued. The law under which the prosecution was commenced, is embodied in the 22d section of the act of the 3d of March, 1825. It provides, "that if any person or persons shall, on the high seas, or within the United States, willfully and corruptly conspire, combine and confederate, with any other person or persons, such other person or persons being either within or without the United States, to cast away, burn, or otherwise destroy, any ship or vessel, or procure the same to be done, with intent to injure any person or body politic, that hath underwritten, or shall thereafterwards underwrite, any policy of

insurance thereon, or on goods on board thereof, or with intent to injure any person or body politic, that hath lent or advanced, or thereafter shall lend or advance any money on such vessel, on bottomry or respondentia," &c.

The first position of the counsel who concluded the argument on the motion was, that the act was unconstitutional and void. He contends that the object of the law was, to protect insurance companies, and that congress has no power to pass such an act.

This act does not purport to be for the protection and regulation of insurance offices. It is clear that congress can exercise no power over contracts of insurance. It has been decided that when a policy of insurance was on a ship on a sea voyage, as the policy operated upon the water, and not on the land, that it was a marine contract. This is contrary to the English doctrine, as it requires the contract to be made on the water to give it the character of a marine contract. The courts of common law, in England, have been strongly opposed to the admiralty jurisdiction. And the rule is well settled there, that it cannot be exercised within the body of a county. It can be exercised over no water where the tide does not ebb and flow. The supreme court of the United States have adopted a more reasonable doctrine, long established by the civil law, that a maritime jurisdiction may be exercised over navigable waters. Navigableness is the true test, and not the flowing of the tides. It is known that in England there are few if any rivers navigable higher than the flowing of the tide, and this is generally the case with the rivers in the Atlantic states. This, was, no doubt, the cause why the English rule was first followed by our courts in this country. There seemed to be no good reason why the same rule should not be applied in both countries, as the navigable waters of both were made navigable by the tide. It was a convenient term, at first used to describe the extent of navigable waters in England. We have adopted the fact rather than the definition of it. Wherever commercial crafts may float between two or more states, the maritime jurisdiction extends. But independently of this view, under the constitution, congress has the same power to regulate commerce among the several states, as with foreign nations. As regards the present case, no distinction need be stated, if any exist, between the regulation of our foreign and domestic commerce.

Is the scope of the act in question to protect policies of insurance? What is clearly the object of the law? The conspiracy charged is against a vessel and her cargo, upon a river under the protection of the commercial power of the Union. The protection of commerce is the object of this law; the protection of insurance policies is merely incidental. Congress might have punished the

burning of the vessel, but it was not thought proper to do so; it has leveled its enactment at the incipient stages of the offense. The law in its object is preventive; by inflicting the penalty on the determination to commit the crime. It does not go behind the overt act to the motive, as the laws of omniscience; but it strikes at the first manifestation of the intent. Whether the conspiracy is formed on the high seas, or within the United States, is of no importance. The offense is so far consummated as to come within the act when the conspiracy is formed. It was wise to strike at the first step, as it gives time for reflection and repentance. The words of the section apply as forcibly to vessels on our rivers and lakes, as on the high seas. The mischief is as great in the one case as in the other. But the opportunities and motives to commit the offense against our internal commerce are much greater than against our foreign commerce. Under such circumstances can any court hesitate to consider the law according to the express language used, as punishing the offense, whether committed on our internal or foreign commerce. The invoices are alleged in the indictment to have been false, and if they were really so, it is argued there could be no conviction, as the conspiracy charged is to destroy the cargo.

Can the defendants claim an exemption from the penalty of the statute, by committing a double fraud? A fraud in having false bills of lading, and another fraud in conspiring to destroy the cargo. False invoices or bills of lading would establish the fraud charged. If a party is not liable under the act of congress when the shipment is fictitious, he would be protected from punishment by his own fraud. This is inadmissible in any code of morals, and especially is it against the law. We have not time to read the indictment through, but our impression is, on hearing it read, that it is sufficient. The defendants can avail themselves of any fatal defect in the indictment at a future stage of the proceeding. The motion to quash the indictment is overruled.

The jurors being called, Messrs. Morton and Stanbery, on the part of the government, demanded the exercise of their peremptory challenge after the defendants had challenged.

Judge Walker had never heard of the violation of the rule that the government should challenge first, and then the defendants exercise their right, except in two instances.

THE COURT decided that the challenge should be exercised alternately.

Counsel for the government had no objection to the jury if the defendants had not. They waived the first challenge.

Judge Walker proposed to propound the following question to each of the jurors: "Have you, by conversation with others, or by the reading of newspapers, acquired such a bias as will prevent you returning an im-

partial verdict according to the law and the evidence?"

THE COURT allowed the question to be put.

Mr. Van Slyke answered that he had formed an opinion unfavorable to the defendants; and for that he was excused for cause. The other eleven replied in the negative.

Judge Walker challenged a juror peremptorily. Dr. Mœller was called to fill the vacancy, and begged to be excused because he had formed an acquaintance with Kissane, as physician to the jail. Further discussion took place between counsel. Juror was interrogated by THE COURT. He replied that his sympathies had been somewhat excited for Kissane—had had conversations with him with respect to this case on one or two occasions. Had not such a bias as would prevent his returning an impartial verdict. Had patients that needed his attendance.

THE COURT excused Dr. Mœller.

Mr. Slocum was called to fill the vacancy.

Judge Walker put the question he had before propounded to the other jurors, to Mr. Slocum.

The juror had no bias.

Judge Walker challenged another juror peremptorily.

A. J. Clark was called. Question put by Judge Walker, and answered in the negative.

Judge Walker asked the defendants whether they desired he should make any further challenge.

Mr. Stanbery now claimed to exercise the right to peremptory challenge for the government.

After consultation between the judges, THE COURT allowed it.

A. J. Clark was challenged by Mr. Stanbery.

Judge Walker challenged the juror who was called in Mr. Clark's place.

Benj. Tresenrider was called to fill the vacancy. Question put and answered in the negative.

Mr. Slocum was challenged for the defendants.

John R. L. Seegur was called. Question as to bias put and answered in the negative.

Dr. Toland was challenged by counsel for defendants.

James L. Farren was called. Question put as to bias by Judge Walker.

Juror:—"Know nothing about the case—would rather be excused from serving—just stepped into the court five minutes ago to see who Judge McLean was. Had no idea of being called as a juror."

Mr. Miner was challenged for the defendants.

Henry Wellhamer was called, and came in crying—I wish to be excused, judge.

McLEAN, Circuit Justice: Very likely—but for what reason?

Juror:—I have just set out on a journey.

Mr. Wellhamer was excused for that reason by the court.

Mr. Taylor called. Question put as to bias—answered in the affirmative, and was therefore excused.

William Blynn called. Question put as to bias—answered in the negative.

Another juror challenged by Judge Walker.

Geo. W. Slocum called. Question put—answered "no."

Another juror was challenged.

A. McCrea was called. Question put—answered: he had read the preliminary trial and formed an opinion. Excused.

A. Tyler called. Question put—answered in the negative.

Mr. Tyler was challenged.

There being no prospect of completing the panel, the court adjourned.

Friday, October 21, 1853.

The calling of jurors to complete the panel was proceeded with. Some jurors were excused on the plea of sickness or inability to endure the confinement attendant on the trial. The jury, as finally constituted, stood as follows: Joseph Newell, Levi J. Haughey, Wm. L. Brown, E. B. Sacket, Jas. L. Farren, Geo. W. Slocum, Wm. Aston, S. V. Martin, John Miller, F. C. Sessions, C. W. Kent, Henry Miller.

Mr. Morton, Dist. Atty., opened the case for the United States, as follows:

The grand jury of the United States, for the district of Ohio, at the last April term of this court, returned as a true bill, a bill of indictment against Lyman Cole, William Kissane, John N. Cummings, George P. Stephens, William H. Holland, Benjamin W. Kimball, James W. Chandler, James G. Nicholson, Adams Chapin, Amasa Chapin, Rufus Chapin and Lorenzo Chapin, charging them and one Lucius L. Filley, deceased, with entering into a combination and conspiracy to burn the steamer Martha Washington, and with afterward setting on fire and burning said boat. The time and place of the conspiracy is laid as of the fifteenth day of December, A. D. 1851, at Cincinnati, in the district of Ohio. The burning of the boat is alleged to have taken place on the fourteenth day of January, A. D. 1852, near Island Sixty-Five, in the Mississippi river, about sixty miles below Memphis. The object of the conspiracy was to injure and defraud underwriters who should thereafter underwrite policies of insurance upon the hull and cargo of said steamer. The first count charges the conspiracy in general terms in the language of the statute, without specifying any overt act. The remaining seven counts charge the offense in the same manner, together with divers overt acts, done and performed by some or all of the defendants in furtherance of the common design. All of the remaining counts particularly set forth and describe policies of insurance, which were obtained by the defendants, and the sixth count alleges that divers other policies of insurance were pro-

cured by the defendants from underwriters to the grand jury unknown.

Nine only of the defendants are now on trial. James G. Nicholson, the clerk of the boat. was arrested before the finding of the indictment, and was discharged on bail. He did not appear. and his bail bond was forfeited at the last term of this court, and he is still at large, as also are Stephens and Chandler. Although the most diligent search has been made for them, they have not been found. The others (save Filley. who died before the indictment was found) are now on trial. To this indictment the defendants have plead not guilty, and you are now impanneled to try the issue between them and the government. It is the duty of the government to preserve the peace and good order of society, and for this purpose laws are enacted defining those acts which constitute a crime. and fixing a penalty for its perpetration. When a person is legally accused of a crime or misdemeanor he must be tried. and if found guilty, must suffer the penalty of the law. The welfare of the community, the very existence of civilized society depends upon the due administration of law. But it is also a high and sacred duty of the government to protect the innocent and unoffending in the enjoyment of their rights, and when a man is accused in the courts of justice, it is incumbent upon the officers of the law to afford him every possible means of establishing his innocence, and to prevent any unfairness to be practiced in procuring his conviction. The high character of the judges who compose this court. and the distinguished ability and learning of the professional gentlemen who appear on behalf of the defendants. and (if I may be permitted to allude to it without giving offense) the number of counsel employed. is a sufficient guaranty that they will have a fair and impartial trial, and if innocent will certainly be acquitted. You, gentlemen of the jury, are too well informed of your duty as jurors and the obligation of the oath you have just taken to permit any thing but the truth as it shall be given you in evidence, to affect your judgment or influence your verdict. You will direct your attention to the law and the testimony, and carefully, exclude from your consideration every statement or rumor which you may have heard or read, calculated to prejudice these defendants. You have already discovered that this investigation is to be a protracted and laborious one. and will call for the exercise of all the patience and candor of which you are possessed. That such an accusation as is contained in this indictment should be allowed to pass without legal investigation, or that after conviction the offender should escape the severest penalties of the law, would be an everlasting stigma upon our institutions of government. A distinguished lawyer and statesman of Ireland, speaking of the administration of law in the courts of England. said that with a coach and six any man could drive through an act of parliament. For the honor of my country I hope the time may never come when this may ever be truly said of the courts of the United States. Of the courts of republican America let it ever be said that here the stream of justice flows ever pure and uninfluenced by affection, unintimidated by power, and undefiled by corruption.

Let us inquire now for the law upon which this indictment is founded. What is the mischief designed to be prevented by it? It is to prevent combinations and conspiracies to burn any ship or vessel with intent to defraud any underwriters. Three things must exist to constitute the offense—the confederation or agreement of two or more persons, to burn a ship or vessel. for the purpose of defrauding underwriters. If the conspiracy be proved and the intent be established, viz: to defraud underwriters, yet if it be to burn a house it would not sustain this indictment. The fraud which this law is intended to prevent is that alone which can be effected by the burning of a ship. We can clearly see then that it was that great department of the business of the country which is carried on by means of ships or vessels, that is intended to be protected by this act.

Several important inquiries arise upon the law of this statute, but this is not the proper stage of the investigation for their examination. It is sufficient to say, "ita lex scripta est." Thus the law is written. We must observe the law without enquiring into the reasons of it. But the necessity of this law is obvious. We are a commercial people, made so by our vast industrial and agricultural resources. Our rivers furnish exhaustless supplies of power for propelling machinery as well as do our mountains of coal and great forests. The mineral wealth of the country needs not to be transported to great distance to be manufactured. for here both the raw material and the motive power are found in the same region of country. But of what use are manufactories without a market? and there is no market without commerce. Our own wants are already supplied in every species of product of our own industry. We must exchange our own for those of other nations or we derive no profit from our labor. Consider next the agricultural wealth of this country. Here is the granary of the world. the Egypt of modern times. Here lie the rich valleys, the fertile hills, the broad plains and illimitable prairies of the Great West, all teeming with the luxurious products of the soil. But what of all these, and of what value are they to us if we have not commerce? Our richest treasures turn to ashes in our hands if we can not carry them to the people who inhabit less favored regions of the earth. But we have the means ample and sufficient for all these wants. We have steamers, we have sail ves-

sels, we have the stately ship and the humble navigator of the creek and canal. Every river and lake, every pond and basin from Newfoundland to Mexico, from the Alleghenies to the Rocky Mountains, is agitated and kept in motion by these vehicles of commerce. Byron said, in describing the movements of a ship, "she walks the water like a thing of life." I would improve the simile by saying that these instruments of commerce make the very waters instinct with life and action.

The amount and value of property daily floating upon our navigable waters is vast almost beyond the reach of calculation. To those not engaged in commercial pursuits, and not accustomed to study commercial statistics, a statement approximating any where near the truth would be considered exaggerated and wildly extravagant. But commerce is a hazardous pursuit, peculiarly so. Out of the necessities of this immense commerce associations of underwriters or insurance companies have sprung up all over the country. Some have been fortunate and successful; others have been overwhelmed by losses, and those engaged in them brought from affluence to poverty. Their office is to protect commerce by assuming its hazards and risks. The influence of these associations of underwriters has been in the highest degree salutary to the commercial interests of the country. When the merchant or the producer embarks his entire fortune upon a frail ship for a distant market, these associations are ready to assume all the hazards of the voyage, and to guaranty its safe arrival at the port of destination, for a small proportion or per centage of its entire value. In case of a loss, the calamity, instead of falling with crushing weight upon the owner, and consigning himself and family to beggary, is distributed upon a great number, who, by a contribution of small proportions, are enabled to restore to the owner the entire value of his property, generally without serious damage to any one. Thus the loss is assessed upon the whole commercial community—a worthy and enterprising member of it is saved from ruin, and his business is continued without interruption. Thus, by means of the principle of insurance, a pursuit in itself the most hazardous, is rendered entirely safe, and greatly facilitated and encouraged. The protection and fostering care of the government has been extended to these associations, whose prosperity has justly been considered a matter of great national concern. The people in the formation of the constitution of these United States took care to remove this subject beyond the reach of the cupidity and selfishness of individual states, and entrusted it to the keeping of the national government. Hence the passage of the law by congress upon which this indictment is founded. The court has decided that congress has power to pass this law; if it could

not elsewhere be found in the constitution, it seems to me it might properly be referred to the general grant of power to pass all laws necessary to the exercise of the power expressly granted. But this is not the time to discuss, nor is a jury the proper tribunal to pass upon that question.

The voluminous nature of the testimony, the multiplicity of the facts involved, render it impossible that I should at this time communicate to you a particular and detailed statement of the proofs which will be adduced on the part of the government in support of the indictment. I shall content myself with merely pointing out to you under general heads, the nature and kind of proof which will be adduced in testimony before you.

I. The relations of the defendants to one another will be shown. It will appear that a part of them were on the river Rio Grande, during the Mexican war, not as soldiers, but as followers of the camp, in pursuit of private gain. That they were intimately associated and closely connected together, while in that country. Those who were thus engaged on the Rio Grande, are Cole, Cummings, Holland, Stephens, Chandler, Nicholson, and two of the brothers Chapin. After the close of the war, they are found congregated at Cincinnati. Subsequently Kissane, and the two other brothers Chapin, and Filley, a partner of the Chapins, are admitted to their fraternity, and often seen in their company at divers places in and about Cincinnati, at unusual hours, and with no apparent business. They were often engaged in private consultation, the object of which was concealed from all but themselves. Save Filley and the Chapins and Kissane, none of them were engaged in any ostensible business, and some of them were strangers, sojourning only temporarily at Cincinnati. These interviews and consultations took place frequently before and for some time after, the burning of the boat.

II. It will appear that the defendants, in December, 1851, concocted the purchase of the steamer Martha Washington, an old and dilapidated boat, and caused her papers to be made out in the name of Lewis Choate, who was in no way interested in the purchase. The reasons for this purchase, and for the adoption of the name of a fictitious owner, it will be important for you to ascertain. For the prosecution it will be contended that this was the scheme of fraud intended to be perpetrated upon the insurance companies.

III. In order to procure policies of insurance and advances from consignees, the defendants pretended to ship large quantities of merchandise on board said steamer, and procured from the captain and clerk of the boat (who are charged as conspirators in this indictment) false bills of lading by means of which they succeeded in obtaining policies of insurance and advances to a very large amount. Most of these were effected upon

the sixth and seventh days of January, and from that time up to the 12th of January, 1852, in the short space of six days and at numerous places in parts of the country remote from each other.

IV. The boat left Cincinnati on the night of the 7th of January, 1852. While on her way down the river, goods were put off at different ports which were marked as consigned to New Orleans and more distant ports. The boat was burned near Island Sixty-Five, about sixty miles below Memphis, on the Mississippi river, at half-past one o'clock on the morning of the 14th of January, 1852. The captain, mate, and clerk of the boat were all up, neither having yet retired to their berths, and neither of them were on duty at the time.

V. After the burning of the boat the defendants entered upon a concerted course of action to render each other mutual aid in effecting the payment of the policies thus obtained by means of false papers and false oaths. The insurance companies demanded proofs of quantities and values of the goods on board at the time of the burning. These defendants made false invoices to one another in order to consummate the fraud on the companies, and added the crime of perjury to that of conspiracy, arson and murder. Consignments of inferior articles of trifling cost, described as being articles of a superior kind and great cost, will be shown to have been made by these defendants upon this boat. Some of the defendants failing to produce original bills of purchase, pretended that the same had been destroyed as papers possessing no value. It will be shown that the amounts of property pretended to have been shipped by these defendants are incredible, considering their limited means and credit. The quantities of particular kinds of goods are incredible for any one house or person to be possessed of at that time in the year and state of the market with reference to supply and demand. They were pretended to be shipped from Cincinnati to New York, when they were actually worth and would command a higher price, if they had them to sell, in Cincinnati than in New York, and the goods were of a kind to meet a ready sale for cash, as there was a scarcity in the Cincinnati market. The goods I now refer to are hides and leather, of which it is claimed immense quantities were shipped by some of these defendants on board of this ill-fated boat. We shall offer proof to show that if the goods which these defendants procured to be insured had been on board, she could not have floated them and the goods actually shipped by other persons. It will appear that there were goods on board of this boat which were lost but they were not the goods of these defendants and upon which these insurances were effected.

VI. Having thus proved to you that the defendants are guilty of this unlawful combination and conspiracy by the testimony to which I have alluded, we shall then produce the confession of Lucius L. Filley, one of the conspirators, now deceased, made in his life time, in which he gives the details of this horrible crime, and fully discloses all the parties engaged, and the part which each performed in the tragedy, which resulted in the destruction of a large amount of property, and the lives of sixteen at least, innocent, unoffending human beings.

Thus, gentlemen, I have briefly stated the kind of evidence relied upon by the government for a conviction in this case. By keeping these general divisions in view, I believe you will be enabled to perceive the application of all the testimony which will be submitted on the part of the prosecution.

After a large number of the witnesses in favor of the prosecution had been called and sworn, the counsel for the defendants observed to the court, from the nature of the prosecution, and the circumstances attending it, they deemed it important to have the witnesses separated, so that they should not hear the statements of the one under examination. This was not objected to by the counsel for the prosecution; and it being a motion often made, rarely objected to, and never denied in a criminal case, the court entered the order.

The witnesses for the prosecution were then called and examined in the following order:

Robert McGrew. Sen.—Stated that he lived in Cincinnati in 1851, on 7th street, between Main and Walnut. He knew Holland, Kissane, Cole, Nicholson, and Stephens. In October or the beginning of November of that year, Stephens and Edwards came to his house to board. Holland came next; was brought to his house by Stephens. Young Cole was introduced by Holland. Cole and Kissane came to see Holland. Cummings was brought to his house to dine by Holland. Capt. Cummings and Kissane were often there. Never saw Cole, the defendant, there but once. Saw Holland at Kissane's pork house. Holland said he became acquainted with Cole and the Chapins in Mexico, on the Rio Grande. Holland, Edwards, and Stephens, with Cole, and some others, were engaged in running a steamboat on the Rio Grande. It was here objected that the statement of Edwards, who is not a party on the record, could not be received as evidence against the other defendants. THE COURT stated that the conspiracy must be proved, before the statements of those who were engaged in it, but were not indicted, could be received as evidence against the defendants. But as the prosecution proposed to prove the combination, the court would, for the present, hear the witness.

In a few days after the above, the witness states that Edwards and Stephens left the house of witness, as they said, for New Orleans. Edwards said he was going in January on the Martha Washington, to take command of a boat on Red river. Holland returned after the burning of the Martha Wash-

ington. Sometime afterward Stephens returned. Stephens first came to the house of witness, and afterwards, brought Holland to the house. Stephens remained three or four weeks. Holland remained longer. Saw Nicholson once when he called to see Holland. He appeared to have no business. Stephens said he came to receive the insurance for the goods lost on the Martha Washington. Heard Kissane say that he had never known. Holland or Stephens, until he saw them at the house of witness. On cross-examination, witness says, that when Kissane called at his house, he saw the persons above named in the public room. He talked about having some tanks, and requested Stephens to call and see the tanks. At the time Holland was at the house of witness, the river was frozen over.

William Northup—Witness lived in Cincinnati in 1851. His place of business was corner of Court and Walnut. In 1842 the witness lived on Fourth street. In the winter of 1851, before Christmas, saw Kissane call frequently on Cummings.

Robert McGrew. Jr.—States substantially, facts, as related by his father. Mr. Walker, one of the counsel for defendants, made the objection again that no confessions of a party, not in the indictment, should be received to inculpate the defendants, until the conspiracy shall be established. 2 Starkie, Ev. 327, was cited. 2 Russ. Crimes, 700, and Rosc. Ev. 417, were read to show that the declaration of a stranger to the record could not be received as evidence THE COURT stated it was a matter of practice in such a case, whether the court would hear the confessions of persons not on the record, to implicate the defendants, when an assurance was given by the prosecution that they would connect the person with the conspiracy. But THE COURT observed, that the better and safer rule was, not to hear such confessions, before prima facie evidence was given to connect the witness with the conspiracy. 3 Greenl. Ev. 58; 34 Eng. Com. Law. 400; 2 Russ. Crimes, 677. The witness, McGrew, further stated, that Stephens paid his father for the board of Edwards, and also furnished Edwards with some clothing. Edwards had no boxes of merchandise at his father's. Holland, when he returned, had but little property, after the boat was burnt—a carpet bag was all.

Mr. Penniman — Witness lives in Terre Haute. In 1851-2, lived in Maysville, Kentucky. He was acquainted with several of the defendants. The winter before witness was acquainted with Nicholson at the City Hotel in Cincinnati. Nicholson spoke to witness at Maysville; said he was on his way to see his wife at the Esculapian Springs, in Kentucky; before the Martha Washington sailed. Said he had purchased that boat. Witness boarded at the Walnut Street House, in the spring of 1852, and saw Kissane, Nicholson, and Cummings walking on the street. Also he saw Nicholson and Cummings at Kissane's place of business. Had some conversation with Capt. Cummings, who said the boat took fire on the larboard side.

Mr. McGregor—Was one of the owners of the boat Martha Washington. Saw an advertisement saying some persons were desirous of buying a steamboat; addressed a letter to Mr. ——, as directed, and received in reply a letter from Capt. Cummings. Witness told him that he owned one half of the boat. Sold both halves eventually for nine thousand dollars; asked at first ten thousand. Capt. Cummings had only three thousand dollars. Finally, Capt. Cummings was to pay on the return trip, nine thousand dollars. On his return he paid six thousand dollars. Capt. Cummings said he had left his money, two thousand dollars, with Kissane. Kissane promised to pay the two thousand dollars, and promised to loan Capt. Cummings one thousand dollars. Kissane offered a draft by Cole, on Boston, which witness did not take. Witness loaned seven hundred dollars to Capt. Cummings, and paid for him a bill, for stores, bought of Cassilly, for three hundred dollars. When the purchase of the boat was first made, Capt. Cummings said he had bills maturing for ten thousand dollars. The boat was four and a half years old; carried six hundred and forty tons. Witness shipped on board the boat the fourth or fifth of January, 24 hogsheads of bacon; 87 barrels of whiskey; 123 barrels of pork, and other freight. Witness recommended Kissane to ship on board the Martha Washington, who said he would if he could. Afterwards Kissane told him the Capt. had refused to take any more freight, and that he had shipped on another boat fifty hogsheads.

Capt. Pierce—Was on the levee when the cargo was being put on board the Martha Washington. Saw her at sun-set the day she left; appeared to be about half loaded. The vessel measured by enrolment 290 tons, but she actually measured more than that. He thinks she had not more than 350 tons on board. Does not recollect whether any persons, at the time he saw the boat, were engaged in loading her. A boat loaded in the stern would elevate the prow of the boat. He thinks the boat was worth seven thousand dollars. Nosing of the boat is that which is a prominence on a level with the lower deck.

Lowel Fletcher—Shipped on board the boat 104 barrels of whiskey, amounting to about 15 tons. Saw a great deal of freight on the landing about 3 o'clock of the day the boat left.

Franklin Calliday—Was at Cincinnati, January, 1852. Went to Louisville; the Martha Washington was then there, the 8th of January; left Cincinnati the 7th. Witness went on board the Martha Washington, at Louisville. Saw Capt. Northup in the cabin. Capt. Cummings said he did not go on as a fog was rising on the falls. The boat was

not fully loaded. Cummings said he waited for insurance—that he had about two-thirds of a load.

Lewis Clawson—Witness in 1852 lived in Cincinnati, was secretary of an insurance company. On the 9th of January, 1852, insured $8,000 worth of merchandise on board the Martha Washington. Did not describe the kind of merchandise. The papers being called for: 1st. Bought of Lyman Cole articles amounting to $6,359.50. 2d bill—bought of Smith & Kissane $248.80. Bought of ——, 13 casks of brandy, &c., $708.80. The bill of lading was in the handwriting of Kissane & Smith, beef and pork packers, manufacturers of candles, also of lard oil. The color of the ink of the signature of the bill of lading, was different when he first saw it from what it now is. An open policy—thirty-three insurances—all except the above, of business in which the insured were engaged.

Mr. Carter—Lived in Cincinnati in 1852. Was agent for Fireman's Insurance Company, —also the Etna of Hartford. Mr. Stephens insured six boxes of merchandise, $5,361. Witness took the insurance. After the loss of the boat, Stephens called; witness told him he must produce the invoices and bill of lading. Copies were afterwards furnished, but not the originals, purporting to be of goods purchased from John Edwards, $5,361. The bill of lading was signed by Capt. Cummings. Witness inquired of Stephens when Edwards had gone South. Stephens referred him to Kissane and Capt. Cummings. Kissane said he had known Stephens a good while, and that he was an honest man, and all right. Capt. Cummings said about the same thing. Witness did not pay the amount of insurance. Cole issued an attachment, and summoned the company as garnishee. It has expended money in procuring testimony, &c. Burton was employed, witness understood, to attend to the business. On the cross-examination, the witness said he believed several insurance companies agreed to pay something to look up evidence. The company in which witness was engaged, paid $500. If the same amount were paid by all the companies, would make the sum of $3,000. Josiah Lawrence. president of the company, was rather opposed to this arrangement. Did not think that Kissane could have committed the fraud.

Mr. Love—Shipped on board the Martha Washington merchandise to the amount of 9½ tons.

William Emerson—Shipped 100 barrels of pork, making 15 tons.

Mr. Leahmer—On 200 barrels of lard oil, amounting to 30 tons, advanced $4,709.65. It was destined to Philadelphia. Lard manufactured by Smith & Kissane, January, 1852, $4,400. On candles, &c., witness also advanced. Charged five per cent. for advances. The bill of lading was signed by Nicholson.

Mr. Mack—Was agent for the Insurance office of Hartford, and made insurance for merchandise on board the Martha Washington for Stephens, 76 cases of boots, shoes, and hats, $3,369.50. Stephens said he bought the goods from Lyman Cole. Had invoices which witness said were unnecessary. After the Martha Washington was burnt, Stephens called to know what papers were necessary to claim the insurance. He had certified copies of the invoice and bill of lading. The originals were required, and they were afterward produced. Invoice of goods shipped, amount $3,372.75, 7th Jan'y, 1852. Stephens referred to Cole, and he spoke well of him.

Zenas Knowlton—Lives in Hamilton county. Knows Lyman Cole. Keeps a tavern. Saw Cole and Cummings at his house in 1851; thinks it was in the fall; might have been in 1850. Had seen Capt. Cummings on the road to Oxford. Saw a good many people travel on the same road.

John Shultz—In January, 1852, lived in Cincinnati. Shipped on board the Martha Washington 203 barrels of flour. Went on board the boat on the evening of the 7th January, 1852. The guards of the boat were two feet out of water. Passengers were at supper. Saw but very little freight on the shore. 25 or 30 boxes were on deck, near the social hall. Does not recollect whether there was a wharf boat or not, near the Martha Washington.

Samuel W. Smith—Witness is of the firm of Smith & Co. They shipped on board the Martha Washington 100 barrels of whiskey.

John S. Brown—Lived at Cincinnati in 1852. He shipped on the Martha Washington 56 barrels of lard oil; 25 boxes of cheese; 2 hogsheads of bacon sides, amounting to 3 tons. Witness saw Chandler; requested National insurance; 4 boxes of revolving pistols, &c.

Mr. Ray—Shipped 264 barrels of red oil, and from 370 to 80 barrels of oil, not red.

Mr. Page—Lived in 1852 at Evansville, Indiana. The Martha Washington, in descending the river, landed at his wharf, and the following articles of freight were put on board of her there: 37 bbls. of lard; 25 bbls. of turnips; one hundred pounds to a barrel; 942 sacks of corn; 140 bbls. of ——, 2½ bushels in each; 332 sacks of corn. Bills of lading signed by Nicholson as clerk. Names on two bills of lading. Smith and Kissane erased, and Nicholson's name inserted.

Samuel P. Hibbart—Witness is a steamboat agent. Engaged freight for the Martha Washington. In 1852 lived in Washington. Capt. Cummings told him not to engage any more freight, as he had engaged a large amount. Witness engaged 525 tons, one hundred barrels not shipped. It is usual for captains to engage freight. Kissane said he had shipped 600 boxes of candles; 600 boxes to another person.

Mr. Morse—Lives in Cincinnati. Was sec-

retary for National Insurance Company. Was applied to for James W. Chandler. Insured $2,200 worth of merchandise on the Martha Washington. At the time of application no invoice was presented. But when payment was claimed after the loss of the Martha Washington, certain papers were in the hands of Chandler, who was arraigned before the commissioner, but discharged by him. Since that time he has absconded. He proposed to prove copies of the papers he took with him, which was admitted. Chandler said he bought these goods from Crane, living on Fifth street, as a boarder; no such man is known to have lived there. Objection being made by defendants' counsel, THE COURT held that before a person, not a party on the record, can by confession charge the defendants, he must be shown, by prima facie evidence, to have participated in the conspiracy. On the cross-examination of Morse, he said that Chandler did not speak of Crane as a fixed resident in Cincinnati. Mr. Raul came with Chandler to the office. Raul is a respectable merchant. Chandler brought Southgate afterward, who gave an affidavit that he saw the boxes that were shipped by Chandler. The witness states that the fund of five hundred dollars paid by his company, was not contributed to aid in a criminal prosecution.

Mr. York—Identified a document.

Mr. Brown—In January, 1852, lived in Covington. Stated no fact of importance.

Mr. Duval—In January, 1852, witness lived in Memphis. The 13th of January, the Martha Washington landed at Memphis, and put off there 15 barrels of lard oil, and 40 boxes of candles. Nicholson, the clerk, left them in care of witness, until he should call for them. The boat was burnt sixty odd miles below that place. After the boat was burnt, Nicholson called for the articles, and sold them to witness for $636.70. Paid cash $90, and a note for the balance, which was cashed by a broker in the town.

Doct. L'Hommedieu—In 1852 witness resided in Cincinnati. Went to the Walnut Street House in 1851; Cole was boarding there, and Nicholson was there. Kissane was there with them frequently. Witness says Kissane came to see them. Was not personally acquainted with Cole. Cole and Nicholson were said to be sporting men, and his attention was attracted by Kissane, a business man, being with them.

Charles Flournagler—Lives in Kentucky—deals in boots and shoes. Witness was at Cincinnati in the winter of 1851. He bought of Chapin's, red sole leather, 17th Nov., 1851, 150 boxes of boots. He purchased between fifty and a hundred sides of sole leather. He bought no kip boots; wanted two or three cases of them.

Mr. Murphy—Lives in Meigs county, Ohio. Was at Chapin's store, 1st Nov., 1851. Called to examine their stocks; he wanted different kinds of articles. They had some red sole leather; their stock was not large. Witness purchased shoes of others.

Mr. Ward—Proves a bill of lading. Between the 1st and 5th of January, 1852, Mr. Dupler called to purchase 10 casks of brandy, and afterwards he bought five more. The first he paid 65 cents per gallon; for the last, 25 cents. Two of the casks of brandy were returned; could not be received on the Martha Washington. Kissane paid for 13 casks $578.90, in soap and candles. The bills for the candles were in Kissane's handwriting. The brandy was directed to be sent to the Martha Washington. The two casks were returned by the drayman, who said that the boat would receive no more freight.

Mr. Casselly—In 1852, the Mechanics' Fireman Insurance Company, at Madison, insured an invoice of goods bought of Lyman Cole, on 1st January, 1852, for 13 barrels of brandy, $1,792.25. After the boat was burnt application was made at the office for payment, and the amount was paid. On the cross-examination witness says he does not know of any arrangement with the insurance offices in Cincinnati, to pay Burton any money. Being again examined in chief, the witness said; a short time after the insurance was paid, he felt suspicious that something was wrong. Lawrence was then alive. Company had a meeting, agreed to pay persons to investigate the matter. Mr. Ross and Mr. Scarborough were employed.

James Chew—In January, 1852, witness was agent for the Utica Insurance Company. Nicholson insured on his for five hundred dollars, and six hundred dollars on two boxes of merchandise. Mr. Laws, who insured for Nicholson, said the boxes contained ladies' cloaks.

Mr. Cranis—Witness in 1852 lived in Cincinnati, and carried on the leather business. He was a creditor of Chapins. He held their notes for $832. He was through their establishment about the time they sold to Cole. White sole leather is tanned with chesnut-oak bark, and it is better than red sole leather. There was a good demand for white sole leather in 1851–2. Did not know of two hundred rolls of sole leather in the city unless Taylor had them. When he went through the establishment of Chapins, did not see any white sole leather. He saw about 20 dozen of sheep skins. On a cross-examination—Chapins gave their note, payable in 60 days; said they had insurance on a large shipment. Their establishment was more extensive than any other in Cincinnati. One hundred and fifty men were employed in the factory, beside outside laborers.

J. K. Thomas—Witness shipped 20 barrels hams on board the Martha Washington.

Mr. Zimmerman—Lives in Lexington, Kentucky; is in business there, and makes his purchases in Cincinnati. In 1851, bought some small bills of Chapins. The next spring bought from them 100 cases of boots, and

10 cases of a different quality. But in Lexington such articles could be purchased lower than in Cincinnati. On the cross-examination, witness said the stock of the Chapins did not appear to be heavy, and in the spring of 1852, it was very small. Burton called on witness to know what he could prove.

John H. Ballance—Lives in Cincinnati. Tans sheep skins. There was a demand for them in the winter of 1851-2. 1600 dozen of sheep skins; never saw so many together. In a bale there are from 200 to 240 pounds.

Wm. Parvin—Witness lives in Cincinnati. and is engaged in the trunk business, which requires the use of sheep skins. In 1851-2 several such establishments in the city who use sheep skins. Never saw a lot of 1600 dozen of sheep skins at one time.

Samuel J. Raney—Has been engaged in the leather business fifteen years. In December, 1851, and January, 1852, the market was heavy. White sole leather was very scarce. Two hundred bales of white sole leather would require 1200 sides. Witness had no knowledge of that amount of white sole leather in Cincinnati. Red sole leather is worth 16 cents; white, 20 cents.

Mr. Thornton—Is a manufacturer of sheep skins and morocco; calf skins. In 1851-2 knew no one who had 1200 dozen of sheep skins.

Mr. Kesler—Witness is a leather dealer and manufacturer of leather. White and red in Cincinnati and New York. Two hundred bales would be a large amount to have in the fall. Witness never saw two hundred dozen sheep skins at once. He has known the firm of Chapins for some years.

Mr. Caton—In 1851-2, was reporter to the chamber of commerce. Took an account of all the freight, and recorded it. Such a report THE COURT held was not evidence unless sworn to.

John Sheier—Witness is a map publisher in Cincinnati. He shipped on the Martha Washington three boxes of charts. Nicholson inquired if he had not better send on board of some other boat. He said that he was part owner of the boat. He said he had invested every thing he had. Said he was insured, and would make a spoon or spoil a horn. Nicholson said he owned the bar.

Mr. Crammond—Witness was on the river, in January, 1852, about one hundred miles below where the Martha Washington was burnt; stopped at the place Saturday night; next morning went on board the wreck. On Monday went on board as wreckers. Commenced their work on Tuesday, and continued Wednesday. Found on board, oil, soap, grease, oil kegs, and butter. Found no rolls of leather, or sole leather; no pistols. The bow of the boat was lying up the stream. Witness asked the mate how the boat took fire. He said he supposed it must have caught in the brooms piled on the larboard side of the boat from the chimney.

The deck was burnt. Witness found 20 bbls. of pork; 50 kegs of lard; five or six barrels of flour: five or six kegs of butter; five or six barrels of whisky; some soap grease. Not one of the barrels bore the marks of fire: nor the sacks of corn which they found. Holland ordered the wreckers to desist, but they refused, and said he had no right. The other party of wreckers,—for there were two parties,—carried away the property, with a good many threats. Chandler made his appearance at the wreck, and claimed to be agent, and exhibited some papers. He remained two or three hours, and then left. Chandler claimed no property; only claimed to be agent.

Mr. Burdell—Witness lives in New York; is a part of the firm of R. H. Burdell & Co. Messrs. Smith & Kissane shipped to the company 300 barrels of pork. Witness proposed he should ship it at $12 per barrel. Said they had shipped on board the Martha Washington. Insurance was taken at $15 per barrel. Worth that at New York.

Mr. Taggart—Lives in Arkansas, near the wreck. Found on the boat, whisky, pork, oil, &c. Nicholson requested witness to take possession of the property saved from the wreck. Chandler and Cummings came together in a skiff. Chandler took charge of the property for New Orleans. Heard Capt. Cummings call Chandler by name. The property was to be left with a man called Jordan at New Orleans if Chandler should not be there. On his cross-examination, the witness says, Cummings called Chandler by name. Heard nothing of any other individual called by the same name. Did not know Chandler. He was to reclaim the property wherever it could be found. McNeal was to go with Chandler. Cummings sold some of the pork, which was not good, the brine having leaked out of it. He sold it at $11 per barrel. It was seven or eight days after the burning before Capt. Cummings came to the wreck.

Mr. Wheeler—Lives in Boston. Secretary of an insurance company. Took a risk on board the Martha Washington, through the instrumentality of James Lee & Co. Property insured, 250 barrels of mess pork, 100 tierces of oil. Total, $5,347 50,—for Lyman Cole. The bill of lading or invoice was in Kissane's handwriting. Shipped also, 167 barrels mess pork: 6th Jan. Smith & Kissane. 83 barrels mess pork, 100 tierces of lard. Papers in the handwriting of Kissane. Mr. Lee accepted; papers were handed over when the insurance was paid.

M. L. Neville—In 1852. witness was secretary of Fireman's and Mechanics' Insurance Company. Insured for Capt. Cummings, $2,500, payment made by Casselly to McGregor. Paid some to Kissane. Cummings said he lent the money to him. This company refused to contribute any thing for the investigation of the case.

Mr. Davenport—Lives in Boston, and is a

manufacturer of boots, and shoes, &c. Received a letter from Capt. Cummings, dated 15th October, 1851, for certain cases of boots, &c. 150 dozen sheep skins were insured by witness for Filley & Chapin; loss paid to the acceptor of their bill. The letter stated the loss was total. Amasa Chapin was authorised to collect debts due Filley & Chapin.

Mr. Tabor—Witness lives in New Bedford, Massachusetts. On the 8th of January, 1852, he received a letter from Lyman Cole, dated at Cincinnati, requesting an insurance on goods on board the Martha Washington, to about $2,000, on 100 tierces of lard; the bill of lading was signed by Lyman Cole, but was in the handwriting of Kissane. On the 26th January, witness received a letter from Cole; wrote another letter dated Oxford, complaining that he had received no answer.

Mr. Riley—Witness saw Nicholson a short time after the boat was burnt, at New Orleans. He asked McDano, captain of a steamer, to bring some freight down from Memphis, on the bow of the boat. Witness said, on his cross-examination, since 1832, he had been on the river as pilot and captain. He stated that the Martha Washington carried a large amount of freight when loaded down to the guards, and, in addition, could carry one hundred and fifty tons.

John S. Tappan—Lives in Brooklyn. Was vice president of Union Insurance Company in 1852. Mr. Kemble came to his office, 12th January, 1852, and applied for an insurance; said he had $10,000 to insure, and witness concluded to take the risk to New Orleans. 26,000 pounds of white sole leather, 200 rolls, in his own name. He held his hand over the names of Filley & Chapin and Lyman Cole. Kemble said he did not insure to New York, because the freight might be sold at New Orleans. On the 16th January, 1852, saw in the Courier and Enquirer of New York, that the George Washington had been wrecked, and that the Martha Washington had been burnt. On the 31st of January, 1852, received a letter from Kemble, stating the loss of the Martha Washington. A despatch of the loss from Capt. Cummings was received by Kemble, and an inquiry was made whether they would pay; the witness answered no. Kemble stated to witness once his interest in the cargo was equal to his insurance. At another time he said it was not, and that some one else was concerned with him. He never showed to witness that he was entitled to this property, except the invoice covering the names signed. Cole had an interest, and another person. Kemble refused to state the other name. Said he would write to Cincinnati; but did not. On the cross-examination, witness said the articles invoiced were, as appears from the paper, 26,000 pounds of sole leather, and 1,600 dozen of sheep skins. The writing was rather a bill of sale than a consignment.

Eliza Martin—Was chambermaid on board the Martha Washington, and was in bed in the last berth but one in the ladies' cabin.

Late at night heard the cry of fire. Went to the folding doors; saw fire in the gentlemen's hall—inside of it. Witness went to the hurricane deck. Carswell helped her from the deck to the land. The boat was landing when she got off.

Mr. Whitney—In January, 1852, witness was secretary to the Madison company. Agent of that company at Louisville took a policy. A. Chapin took the insurance; 200 cases kip boots, signed Filley & Chapin. More than a month after the loss, Mr. Chapin called at the office in Madison. The amount of the insurance was $4,200, which witness did not pay.

Mr. Jones—In New York, in January, 1852, witness was an underwriter in the Atlantic Insurance office. On the 7th of January, 1852, took an open policy—300 bbls. of pork, $4,500; 264 bbls. of pork. Smith & Kissane shippers of the first, Ray of the latter.

J. B. Wilson—In March, '51, witness was assessor. Stock of Filley & Chapin assessed at $3,500.

Mr. Clark—Lives in Cincinnati. Knew Filley & Chapin. Made them temporary loans in the fall of 1851. Made to them weekly loans from one to three hundred dollars. He had difficulty in collecting the loans, &c.

Mr. Lane—Mate of the steamboat Martha Washington at one time. She would carry 550 tons.

Mr. Scarborough—Lives at Cincinnati. Had two invoices in his charge, as counsel for investigation. Insurance on the invoices amounted to $5,458. The Chapins said Cole was interested. Had frequent interviews with one of the Chapins, but received no explanations with which witness was satisfied.

Mr. Shepard—Knew Chandler in Covington. Was a sportsman. Saw him in March, 1852, in New Orleans. As witness was walking the street Chandler came out of a house to see him. Stated that he was on board the Martha Washington. Reached the land by a line on the stern of the boat. Said that he had been employed by Capt. Cummings, at $5 per day. Witness said that Chandler had consulted him as counsel, and that he was not bound to disclose.

Mr. Morton, Dist. Atty.—Read a copy of a letter from Kissane to Nicholson, after his arrest, and was about to state the circumstances under which the letter was abstracted from his papers, when the defendants' counsel objected that such statements could not be received as evidence.

THE COURT—As the abstraction of the letter was a penal offense, for which the person taking it was liable to be indicted and punished if found guilty, the act of purloining the letter could not be received as evidence; but they said, as explanatory of the transaction, and to show the motive of taking the letter, they would hear the statements of the witness.

Mr. Morton then proceeded to state that the original letter, the copy of which he had just read, was with his other papers, carefully

tied up and left in his desk, the door of his room being locked, while he took a short ride in the country. On his return he found that his papers had been handled—were in confusion, and the original letter of Kissane had been abstracted. And other facts were stated, conducing to prove that Kissane took the letter. In the absence of the witness the chambermaid probably entered the room.

Mr. Taylor—Lives in Cincinnati. Has been engaged in the leather business, and carries on the largest establishment in the city. White sole leather is more valuable than red; the white is tanned with chestnut oak bark, and will weigh from eighteen to twenty pounds a side. In the winter of 1851-2 white sole leather was scarce and in demand. Witness had no idea that there was any thing like 200 rolls of that leather in the city, or that there were 1,700 dozen of sheep skins. On being cross-examined, the witness says that leather would sink when saturated with water, also sheep skins would sink under similar circumstances.

Mr. Walker—Walker & Co. shipped on board the Martha Washington in 1852, 100 bbls. of whisky and 360 bbls., as per bill. Delivered the 7th January.

Mr. Polard—In January, 1852, shipped on board the Martha Washington, merchandise, soap, candles, tobacco, ½ bbl. of butter, 2 doz. brooms, 4 bbls. rectified whisky, 2 do crackers. On 7th January, 1852. Copy of invoice: Kissane & Smith, 7th January, 1852. Amount $3,360. Destined to Freeman & Sons.

Mr. Carpenter—Lives in Cincinnati. Business, loaning money. Loaned money up to the time of the failure of Filley & Chapin. When they failed they owed him $250. Went to them and bought $750 worth of goods. Witness settled with Cole, who required him to buy as above.

Mr. Pomroy—Lives in Cincinnati. Firm of Robins & Pomroy. Engaged in shoe business. Manufacture in Massachusetts. In the summer and fall of 1851 purchased 599 dozen sheep skins. Packed up at other places than their own house. White sole leather, witness thinks, was scarce in 1851. (A bill of lading read, signed by Nicholson. Shipped for Cooper 25 tons of goods.)

Mr. Hubbard—Is the superintendent of the House of Refuge. Did the stitching of boots for the Chapins. In Nov. stitched 559 cases or dozens. In December, 257 doz. In October, 100 doz. Witness was at the Chapins' store almost every day. Did not see large quantities of leather on hand. On his cross-examination, witness said he never was in the cellar more than once or twice. Never in the two upper stories of the building.

Mr. Chew—Capt. Cummings applied for an insurance on the steamboat Martha Washington for $4,500, in the name of Lewis Choate, which was taken by the witness. After the boat was burnt, sent Charles Ross as an agent to look after the interest of the insurance company. In February following, Capt.

Cummings and Capt. Choate demanded the insurance money. At the request of witness, certain deck hands were sent to the insurance office to give an account of the loss of the boat, who were examined in the absence of Capt. Cummings and Holland. Capt. Cummings referred witness to two deck hands on the boat who could give him information. They came and had a communication with the witness. A part of the conversation was in the presence of Cummings and Holland. Objection being made, THE COURT held that the statement of these hands in the presence of Cummings and Holland might be received, but that part which was made in their absence was not evidence. The statements received as evidence had no material bearing in the case. The reference to the deck hands was not such as absolutely to bind Capt. Cummings to whatever they might state.

Mr. Lee—Lives in Cincinnati. Shipped on board the Martha Washington 100 barrels pork and 200 barrels of flour, amounting to 37 or 38 tons.

Mr. Shellito—Shipped on board the Martha Washington 100 bbls. red oil, 50 bbls. soap—25 tons.

Capt. Irwen—Once commanded the Martha Washington. When loaded within six inches of her guards might have 450 tons. Loaded to the water. 500 tons. Carried 517 tons.

Mr. Cotral—Is a partner or agent in the City Manufacturing Company. Cole introduced Mr. Stephens, who bought brandy of witness—a number of barrels—and paid for it in staves.

Mr. Caton—Is agent of the chamber of commerce, and his duty is to take an accurate account of all shipments, &c. He presented his record of entries made of articles shipped by the Martha Washington. He could not state positively whether he took the list of articles from the agent of the Martha Washington for freight, or from the second clerk of the boat. His memory being refreshed by examining the book of the agent for freight, but he could not distinctly recollect where he got the items. THE COURT held that the entry of the articles could not be received in evidence. The witness was not able to say where he got the items, and much less could the court or jury decide this fact, on which the admissibility of the evidence rested.

Mr. Carswell—Belonged to the boat. He was asleep in a berth in that part of the boat called Texas. The bell being violently rung by Capt. Choate, the pilot, waked him. He heard also violent stamping on the hurricane deck. This was about one o'clock at night. Witness saw the chambermaid and carpenter. Helped the chambermaid down to the lower deck, then the carpenter, and then the witness got down. Saw the fire extending back to the stern of the boat. The bank at which the boat landed was high. The boat was not fastened to the shore, the

rope being frozen, and it soon floated from the shore. The Charles Hammond came along in about an hour. The passengers generally got on board of her, wet and almost frozen. The chambermaid, cabin boys, &c., got on board of the James Shillinger, which was going up the river. The fire took place about five miles from the wood-yard. After the alarm of fire it was not more than ten minutes before the boat was in a blaze through the cabin No power could control the hands. Every one escaped for his life.

Mr. Murray—Lives in Cincinnati. Is a drayman, and was engaged in the same business in 1852. He run from six to eight drays. He hauled for the Chapins. Hauled six loads for them. Load of sheep skins; red sole leather. There were four or five large loads of leather, and some boxes.

Charles Gibson—Worked in the establishment of the Chapins about five years, including October, 1851. The store was the corner of Pearl and Main.

R. C. Lepper—In 1848 witness was clerk on board the Martha Washington. The witness recollects once she carried 585 tons.

Capt. Ross—Witness for many years has been on the river as captain or pilot. He was appointed agent for the underwriters, and proceeded to the place where the boat was burnt. It floated down the river about six miles from that place and sunk. Witness went on to New Orleans. Was referred to McGregor, at New Orleans, as the agent of the boat. He was twenty-four hours in finding Jordon, the consignee of the cargo. Nobody seemed to know him. He was a dealer in pamphlets. He could give witness no information. Jordon said Chandler had nothing to do with the cargo. He did not know him. By the bill of lading Chandler was the shipper. Another bill of lading was to Jordon. The Martha Washington will carry 575 tons. Witness got no satisfaction from Jordon.

Mr. Wheeler—Worked nearly three years with the Chapins. His business was to put bottoms to boots. Worked in January, 1852, and he thinks, in February, for Cole. Worked for Filley & Chapin through the summer of 1851. In September boots did not sell as fast as they were made. Never worked white leather in kip boots—put white sole leather in calf boots. Never saw sheep skins, except what were necessary for use.

Mr. Carswell cross-examined—While at the boat, the impression was that the fire was accidental. Heard nothing to the contrary until about two months afterward. Capt. Cummings appeared like a crazy person, by his gestures and exclamations at the loss of lives.

Mr. Remur—Remur & Sons, of Baltimore, made an advance for 600 boxes of candles, $2,360. Insured to New Orleans. From the insurance witness paid his advance, and the balance was paid to Kissane.

Mr. Wheatley—Was a clerk of Smith & Kissane. Witness accompanied the latter to swear to the shipment of 600 boxes of candles, and witness swore to it, not knowing any thing about it, and this was known to Kissane. After they left M'Guffey, the person who administered the oath, Kissane said to witness he would never hear of it again. Afterward witness swore to the same fact before a commissioner. He was in the habit of getting bills of lading. He did not see Kissane tear out this bill of lading from the book.

John Phillips—Worked as a boot bottomer for Filley & Chapin. Was in the store every week. Used red sole leather and white. No more leather of either kind was necessary to carry on their business.

Mr. Ford—Witness worked for the Chapins in September, 1851; left them the latter part of that month. Had worked for them three years before that time. Don't know that he saw a large stock of leather while there.

Mr. Butler—Worked for the Chapins three years ending in the fall of 1851. Hands pushed to send boots to Louisiana. There were three crimpers employed.

Lewis Choate—Was pilot at the time the boat was burnt, and was on watch. While at the wood-yard he was in the social hall. Capt. Cummings and Nicholson were there also. He remained there until the wood was in, and then ascended to the pilot-house. Capt. Cummings came up; stood in front of the pilot-house; turned round and came into the pilot-house. The boat had not proceeded more than five or six miles from the wood-yard before he smelt paint burning. Witness said to Capt. Cummings, there was fire. He ran down fronting the pilot-house, looking over the hurricane deck, and said, You are mistaken. Witness replied he was not. Capt. Cummings then ran down to the cabin deck. The mate (Holland) was on the hurricane deck. Said the wood taken on board was very dry, and said he would go down. Witness rang the bell violently and stamped; made a good deal of noise. In a very short time after smelling the fire (a minute or two) the fire burst out. Heard no noise in the social hall. The clerk (Nicholson) said he was sitting in the social hall, with boots off and sleeping. Did not know of the fire till witness gave the alarm. He then alarmed the passengers. The fire was bursting some of the windows. While the boat was at the wharf at Cincinnati, Capt. Cummings introduced witness to Nicholson, and said he had promised the clerkship to him at the Springs, in Kentucky. Witness communicated to Capt. Cummings something he had heard said of Nicholson, not favorable. Capt. Cummings went to the person who had made the remark, and inquired of him about the matter, and, on his return, said he could ascertain no definite facts. Cross-examination—Capt. Cummings owed $1,500 in New Orleans, and was afraid the boat might be attached; and it was on this account that the title to the boat

was vested in witness. Witness advised Capt. Cummings to leave Cincinnati late at night, as he would gain more by doing so than by remaining. The boat was about three hundred yards from the shore when he first saw the flames. Thinks the fire could not have been extinguished. He had no suspicions at the time that the boat had·been set on fire. Such a suspicion was not uttered by any one. Witness heard Capt. Cummings ·call Ross agent, and proposed to pay over to him the money, and show him the invoice of the sales of the freight saved from the· wreck. Ross said he did not feel himself authorized to receive the money. Witness called with Capt. Cummings for the insurance on the boat. On the second call Chew said he had received a letter from Capt. Ross, who advised the company not to pay. Witness saw the board of underwriters, and before them insisted that the parties on the boat should be arrested. A second time witness insisted that the parties should be arrested, in order to bring the matter to a full investigation. Mason charged Capt. Cummings with burning the boat. Shortly afterward when the Capt. met Mr. Mason at the Burnet House, he knocked him down, &c. The Underwriters said their object was to protect themselves. Witness did not think Capt. Cummings was guilty of burning the boat. Since the above witness has seen some things which he· did not like as to the boat being burnt—not in reference to Cummings. Where the chimney rests on the boiler fire may be communicated. In thinking there was something wrong witness referred to Nicholson.

Mr. Favor—Witness came up the river on steamboat Breakland. Capt. Cummings, Capt. Choate, and Nicholson. were on board. All on board of the Emperor. Had some conversation with Nicholson, who said when the fire broke out in front, he first heard the alarm. Ran into the ladies' cabin. Said the boat was well sold. This was the 25th, 26th, or 27th of January, 1852. (Other witnesses who knew Nicholson. and who came up on board the said boat, said he was not on board.)

· Mr. Chew—Holland said to witness, after the boat had wooded, and as she was rounding out, he went into the social hall, where Nicholson was sitting asleep. Sat half an hour. Went to the bar, drank something. After some time saw fire in a state-room where mattresses were deposited. Boat was turned toward the shore, was made fast, and the passengers were taken off. That he was left in charge of the wreck. As property was taken on shore it was stolen; there was only one honest man there. The line was not made fast, and when the starboard engine ceased working the boat swung out into the river. On his cross-examination, the boat was insured for $4,500. At the meeting of the company it was not intimated that the boat had been burnt designedly. Choate said that if there was fraud the defendants should be arrested. Nicholson remained in the so-

cial hall asleep, as Holland stated, until the fire burst out.

Mr. Traner—Lives in Cincinnati. Engaged in the shoe business in November and December, 1851. In November bought seven bills, one a case of kip boots, of the Chapins. In making these several bills, witness was in the Main street store and cellar. Saw three bales of white sole leather, 29th November, 1851. Saw sheep skins in the upper rooms; five bales at one time. White sole leather fluctuates. On being cross-examined, witness stated the cellar under the Main street store was dark, and that there might have been rolls of leather in the cellar which he did not see. There were 408 cases in the lower store or room.

J. A. Dugan—Was at New Orleans; saw Nicholson there.

Here an objection was made by defendants' counsel, that after the boat was burnt the act was consummated, and that the confessions of one can not afterwards implicate the other defendants. And it was urged that the boat, to charge the defendants, must have been burnt with a fraudulent intent, to injure the insurance offices. And it was insisted if the insurance companies resist the payment of the money, and the defendants shall fail in the recovery, the offense charged would not be sustained. And to sustain the points urged, there was cited Whart. Ev. 6; L. 261–263; 8 Car. & P. 297; 1 Phil. Ev. 97; 1 Greenl. Ev. p. 136, § 111; 3 Greenl. Ev. p. 88, § 94. The prosecution contended that the partnership or combination was not ended until the money was obtained, and cited 2 Starkie, Ev. 32; 1 Greenl. Ev. 111; 11 East, 584; [American Fur Co. v. U. S.] 2 Pet. [27 U. S.] 364; 4 Wend. 261. THE COURT held that it was not necessary to prove the burning of the boat to sustain the indictment against the defendants. If they conspired to burn the boat to defraud the insurance offices, the offense was consummated. In this we see the wisdom of the law. The crime was committed before the perpetration of the overt act. The punishment of the conspiracy to do the act makes the incipient stages of the offense as criminal, and by that means intends to arrest the consummation of the crime. The act of burning the boat is evidence in the case, as it may, connected with other facts, show a conspiracy, or conduce to show it. But this is not a point in the evidence beyond which the prosecution can not go. The conspiracy may be inferred from attempts to obtain the money. The entire transaction is a matter for investigation, by which the innocence or guilt of the defendants may be shown. As the burning of the boat is not, necessarily, an act to consummate the offense, it can have the effect only, like any other fact which conduces more or less to show the nature of the transaction. The witness may proceed in his statement.

Mr. Dugan continued—Nicholson said that

he had been in bed; heard a roaring; got up and saw the fire.

A. Jones—Lived in Cincinnati in 1851–2. Is a relation of Filley, the partner of Chapin. Filley died the 28th of October, in the year 1851.

Mr. Mason—Lives at Buffalo. Was at Cincinnati in the spring of 1852. Called on Nicholson to ascertain the facts of the loss of the boat. He said he got up about midnight at the wood-yard where the boat stopped to wood, and paid for the wood. He said that he sat down in the social hall; fell asleep, and was awaked by the ringing of the bell. At first saw nothing, but soon discovered fire bursting from the state room near the chimney. Witness wished a memorandum of articles, which he could not give. Nicholson introduced witness to Capt. Cummings, who knocked witness down. Davis & Co.'s bill of lading, 11,477 lbs.

Mr. Carson—Lives in Baltimore. The insurance, according to the invoice; one hundred dollars more than the amount and upwards of five hundred dollars above the amount advanced to Smith & Kissane. The surplus was paid over to them.

Mr. Johnson — Witness is a confectioner. Was cook on board of the Martha Washington. When loaded at Cincinnati her guards were from six to ten inches out of water. Nicholson kept the Esculapian Springs; in Kentucky. He and Cummings agreed to purchase a boat, and the Martha Washington was purchased. The fire occurred in the room aft the chimney on the larboard side. The carpenter was in the same room with the witness. The clerk's office was on the starboard side—partition between the room and chimney. Nothing in the first room aft. Was awakened by the ringing of the bell, and stamping. Looked through the inner door—saw fire in the social hall. Waked the carpenter, who was sleeping in the same room. Passed through the social hall into the cabin. Saw Nicholson running (towards the hall) in the cabin. Witness then went down to the lower deck—there saw Holland and Nicholson. When witness first saw the fire it was about four feet at its base, and its blaze ascended to the ceiling. Boxes were piled up on the larboard side of the social hall—on these boxes were piled several bundles of brooms, and of brown paper. The fire was burning on this paper three or more feet. Nicholson kept quiet. Capt. Cummings in great distress returned to the boat. He was without hat or coat, and used great exertions to rescue the passengers. A man could not live more than two minutes in the water, the cold was so intense. The witness believes the fire was communicated to the boat from the chimney.

Mr. Heartwell—A bill of lading of Smith and Kissane, dated early in March, 1852, appeared to have been written only a few hours before, signed by Nicholson, was presented. When he first saw the bill the ink

was blue and fresh; afterward it became black. Burton at this time was not known to the underwriters. Loaned Burton $2,000, indorsed by Dennison. Afterward made another loan of $1,000. No interest has been received. The note has been twice renewed. Insurance offices agreed to take the notes without indorsements. In January, 1853, the company advanced $850. Subsequently advances amounted to a little more than $4,000.

Mr. Lee—Lives in Boston, and was engaged in the commission business in 1852. In pursuance of a request of L. Cole, witness, insured for him, for mess pork on board the Martha Washington, $5,000. Insured 10 per cent. profit. Register of the Martha Washington given in evidence, specifying it to be 350 tons, &c.

Mr. Burton—Lives in Ohio City. He became acquainted with two of the Chapins in 1846, within which year they failed. He knew L. Filley, the partner of Rufus Chapin, and did business with them and continued to do business with them until the 3d December, 1851. He sold to them 160 dozen, of sheep skins, and deposited with them 182 dozen. A short time after witness returned home, Rufus Chapin came to Cleveland, and calling on the witness, said he wished to procure a note discounted for six hundred dollars. Witness went with him to the bank, but could not procure the discount of the note. Chapin wanted to buy white sole leather. Witness went with him to a large leather dealer in Cleveland, but he would not sell on the terms offered. Witness again went to Cincinnati about Christmas Eve. Called on the Chapins the next morning, and found Lyman Cole with them. He inquired for the 182 dozen sheep skins which he left on deposit, and with the view of securing the Chapins for a note they had indorsed for him. He applied for the sheep skins, Cole being in possession of the property. Cole said: Let Burton go to the devil with the rest of the creditors. Filley, and Burton, and Earl, witness says, made an estimate of the stock, amounting to the sum of $8,500. Witness saw all the Chapins at R. Chapin's, and also Kissane. Cole and Capt. Cummings were at the Chapins. They had not 200 rolls of white sole leather. Saw a very small amount of that article. Witness also met Adams Chapin. The witness was greatly displeased that the bales of sheep skins which he left on deposit were not delivered to him, and threatened to bring suit. It was arranged that witness should be made secure through one of the insurance offices. This was after the loss of the boat. The insurance in the name of Kimball was the office designated. Adams Chapin promised that the insurance papers should be ready. Having received the papers, witness went to Owego to Kimball. Witness found him keeping an eating house near the railroad. He walked with him some distance and sat down on a log. Witness informed Kimball that he had come to get his

money from the Chapins, and if he did not pay him in fifteen minutes he would blow up the whole plot. Kimball said if he did he would blow up $60,000. Kimball agreed to meet him in New York and pay him his demand, if the insurance money could be obtained. But he failed to obtain the money. Witness again threatened, and said he would expose the whole transaction. Kimball said Cole was never yet caught. Some time after this he saw Capt. Cummings, the Chapins, Cole, Kimball, and others, and told them that they had got to pay him. The Chapins complained that the offices would not pay. Witness asked for bills of purchase. Was informed that the bills had been burnt by Chaney, the purchaser from Cole, supposing they were of no importance. This was the forepart of June. Chaney was a brother-in-law of L. Cole, and had bought out Cole, and was carrying on the business at the same place. Adams Chapin said Filley & Chapin had put $5,400 in the boat. Witness saw Scarborough and had some conversation with him respecting the transaction. Also had some conversation with Filley, after his father had been out to see him. Cole and Kimball had an interest in the shipment. Witness told the Chapins they had never shipped the sheep skins. The next visit the witness paid to Cincinnati his life was threatened. Amasa and Lorenzo Chapin came into his room at the Dennison House, and inquired what he was going to do with or to them. This was the 20th October, 1852. Witness replied that he was going to take them through. They said they were too hard for that. The witness replied, we will see. The witness received letters from Filley & Chapin, asking him to forward to them sheep skins. At the time the witness sold to the Chapins 160 dozen of sheep skins, he deposited with them 182 dozen, which were stored. Chapins gave him a note for his accommodation, to pay for the skins sold by him. The defendants said they had not bought 50 dozen of sheep skins, except from him. This remark was made by Adams Chapin, Filley, and Rufus Chapin. On cross-examination, the witness said that the 160 dozen were all the skins which witness sold to the Chapins the last time. Paper presented, signed by witness, for 112 dozen afterward. Witness took 2,900 dozen sheep skins in the years 1849–50 to New Orleans; 5,000 dozen during the spring and summer of 1850; 6,000 dozen in 1851. He says 100,000 dozen might have been manufactured in Cincinnati in 1851. The firm of Filley & Chapin, at the time of its failure, owed the witness $2,560. Adams Chapin asked him of whom they got the sheep skins. Said they got them from the witness, and the witness answered it was right. The witness, then inquired of whom they got the sole leather. They replied, from different persons. Witness asked in regard to several sums of money alleged to have been received by him from certain insurance offices, which question was objected to; but the court held that the witness might be called to explain the facts attempted to be proved, as to moneys received by him, as such facts were intended to be used against him. The witness admitted the receipt of $5,500 from the insurance offices, and, in addition, $7,000, which had been advanced by his brother, who lives in Vermont, as a loan.

Mr. Darr—In Milne's office payment was made for the Martha Washington. A deposit was made, to secure the purchase, in Milne's bank. The following sums were paid: By McGregor, $1,000; check of Smith & Kissane, $1,000; by Capt. Cummings, $1,100; in currency, $1,700; transferred credit to McGregor, $2,000.

Capt. Ross—Boat was registered in the name of Choate, because there was a judgment of fifteen or sixteen hundred dollars against Capt. Cummings in New Orleans. One trip in the name of Choate.

Mr. Bretonhall—In 1851 lived in Cleveland. In the winter of 1851 Chapin applied to him for white sole leather, and said he could not get white sole leather for use. Said he could not get it at Cincinnati. This was before Christmas.

The testimony on the part of the prosecution having closed, Mr. Ewing, of counsel for defendants, moved that Kimball be discharged, on the ground that no evidence had been given which inculpated him, in any respect.

The defendant rose as soon as his counsel had closed his remarks, and expressed a wish that the motion made by the counsel should not be insisted on. That he would abide the fate of those who were associated with him in the indictment. The counsel then waived the motion.

The counsel for the defendants called their witnesses. Many of them answered to the call—others did not. An inquiry was then made of the court by the defendants' counsel, whether it was necessary the witnesses should be sworn, to entitle them to claim their fees. The court intimated that it might be considered necessary for the witnesses to be sworn, by the accounting officers of the treasury, and that it would be the safer course to swear them. At the same time the court said they did not consider it necessary. The counsel then observed that they did not intend to examine all the witnesses summoned, but only those that were considered the most important. And as it was near the adjourning hour, the defendants' counsel stated that if the court would adjourn for dinner, it being within thirty minutes of the time, the counsel would so arrange their testimony as to shorten the time of examination. On that condition the court rose until two o'clock.

After the close of the testimony by the United States, Judge Walker, in the defense, made the following statement:

May it please the court: The duty of mak-

ing a preliminary statement of the points for the defense has been assigned to me. And, as I am, in this, to speak for all the counsel, and all the defendants, it became necessary, as I thought, to reduce this statement to writing, and submit it to my associates for their approbation. The same reason makes it proper that I should confine myself now to what I have written. I therefore ask leave to read to the jury what I have now to say. I think this course will conduce both to brevity and precision.

Gentlemen of the Jury: You have listened to the preliminary statement on the part of the government, and have seen how far the promises then made have been performed. You are now to hear from the other side, and in the theory of jury trials, your minds are still as open and uncommitted as when you first entered that box. This is the theory; and I trust it is the fact. I hope and trust that you are prepared to listen to our defense patiently, candidly, earnestly and without bias. The parental government under which we live desires no victims. These defendants are as much her children as you and I; and she has deputed you, their brethren, to try them, under a solemn injunction to presume them innocent until guilt is proved. The burthen of this proof she takes wholly upon herself, giving to the accused the benefit of every doubt. For it is better, far better, that ninety-nine guilty persons should escape human punishment, than that one innocent person should suffer it. The meaning of "verdict" is a "true word"; and this true word you have sworn to pronounce as to each of these prisoners. You are not required to find the same verdict as to all. You can convict some and acquit others, if the testimony so requires; but you can convict no one unless your minds are forced to that result by evidence which is irresistible. I do not say that you must find innocence impossible; but I do say that you must find guilt morally certain. It must be one of those strong probabilities, bordering so closely upon certainty, that in any of the most grave concerns of life, you would treat it as a certainty, and as such, stake your life or liberty upon it, if the occasion required. Your verdict is to be in form positive— "Guilty" or "Not guilty." But in practice this does not mean that you feel absolutely sure of guilt, or sure of innocence. If you say "Guilty," it implies that the evidence so clearly preponderates that way, that you do not find room for a reasonable doubt. If you say "Not guilty," it implies that guilt is not satisfactorily proved—not that the defendants are necessarily and undoubtedly innocent; but that they may be innocent—perhaps are innocent. It means what the Scotch verdict of "not proven" means—that government has not performed what it undertook, namely, to convince you of guilt.

I shall make no appeal to your sympathy, but only to your perception of truth, and sense of justice. Be sure of guilt before you pronounce the irrevocable word, for, so far as you are concerned, that word will remain irrevocable until the day of judgment; and not only be sure of guilt, but of the particular guilt charged in the indictment. No matter what other acts, whether criminal or illegal, these defendants, or some of them, may have committed, if they are not proved guilty of this very crime, they must be acquitted.

What, then, is the charge preferred against these men? It is, that they conspired together to burn this boat with intent to injure underwriters. You have been told that the offense is complete, when the conspiracy is formed,—that no overt act is necessary, and the like. This is true. But then the conspiracy must be definitely found to have been formed for this object, namely, to burn the boat; and with this intent, namely, to injure underwriters. A conspiracy for any other object, or with any other intent, is not within the indictment. You might, for instance, be satisfied that there was an intention to commit fraud; but if it were against any other persons than underwriters—as creditors, for example,—or against underwriters by any other instrumentality than the burning of the boat, you could not convict. You are tied down by the statute and the indictment, to the fact of a conspiracy for this single object, with this single intent. You are to find that all these men, or so many of them as you convict, actually agreed together to burn this boat with this intent. It need not be proved that they all met together at any one time, or in any one place; or that they wrote their names or plighted their oaths to this agreement. But, in some way or other, and at some time or other, before the burning of the boat, all who can be charged as conspirators, must have actually entered into this specific agreement; and this great leading fact as the soul and body of the offense, must be established by such definite and cogent proofs, as leaves no room for any other conclusion. I would lay great stress upon this position; and, therefore, I repeat that the actual formation of this specific agreement and none other— including this very subject, object, and intent—must be substantively and conclusively proved.

Now the proof offered in this case is wholly circumstantial. No eye saw, no ear heard them actually conspiring together. No two of them were ever seen together under circumstances not entirely compatible with perfect innocence. I mean precisely what I say. No witness ever saw any two or more of these men together, when their being so, created in his mind the slightest suspicion that they meditated crime. They met as acquaintances, openly and publicly, and chatted as acquaintances, and that was all. The evidence, then, is wholly circumstantial, and, in the strictest sense of the word, not merely not positive, but the farthest from it possible. And although I do not deny that a verdict may properly be found on circumstantial evidence alone, if it

be strong enough, yet I do not aver the settled rule to be, that in weighing circumstantial evidence, every circumstance is to be rejected, as proving guilt, which can exist consistently and compatibly with innocence.

There is another important rule with reference to the amount of evidence, which is, that it must be proportioned to the enormity of the offense. You would not convict for murder upon as slight evidence as for assault and battery, or petty larceny. This rule proceeds upon the idea that men are not fiends or devils—that in the most depraved there is still some good left, something to which stupendous crime is still abhorrent. Now, the charge here is of a stupendous crime—one of the deepest dye imaginable. When you come to analyze it, you can hardly conceive that men stamped with the form of humanity, could concoct or perpetrate it. And hence you will require the very strongest evidence to make you believe it—almost the ocular proof—for the first impulse of every person, not utterly depraved, is to say, "it is incredible—I cannot believe it—it is too monstrous for belief—I should almost doubt my own eyes," and the like strong expressions.

There is one error which jurors not accustomed to weigh circumstantial evidence, are very liable to fall into. It is, to have regard for the number of the circumstances rather than their nature. And upon this the prosecution appears to have calculated largely. Now, circumstances are not like faggots, where each faggot adds just so much more to the bundle, but rather like the separate links of a chain, where the strength of the chain depends not upon the number of links, but upon the strength of each individual link. We might not be able, and certainly cannot be required to break this entire bundle of faggots, which government has tied so industriously together. But in this chain of evidence, which has been so long and so laboriously forging, we may be expected, and certainly shall be able to break many of the links, and so, we trust, sunder the entire chain. And in what manner we expect to do this, it is now my province to inform you.

Previous acquaintance.—We expected to satisfy you that this acquaintance was not general, but quite limited; that each was not acquainted with all the rest, but some were strangers down to the time of arrest, never having even seen each other. But the fact that some, who are proved to have met, were acquaintances, so far from being cause of suspicion, would fully account for their occasional meetings. It was the most natural thing in the world, that they should meet, and meet often; and it is therefore, most strange, and indicative of a desperate case, that this fact of previous acquaintance, should be turned against them.

Relationship.—The four Chapins are brothers, and Cummings and Kimball married their sisters. But what has this to do with proving a conspiracy? I submit to any juror, looking into his own heart, to say whether the last person whom he could make a confidant of crime, would not be his own brother—whether some hallowed memories would not cry out against it. But, however this may be, the fact of being brothers entirely accounts for their being together so often, and acting so much with and for each other.

Meetings—Much time has been taken up in proving that some of these parties did, several times, meet and talk together—at McGrew's boarding-house—at the Walnut Street House—at the store of Law—and at the store of Filley & Chapin—not that all or so many as half, even, did meet at any one time or place,—or in any secret or suspicious place—any den, dark room, or cavern,—or that they kept a watch or spoke in whispers, or wore disguises, or started at strange sounds, as conspirators would be likely to do, but simply that they met in open day, in the most public places, and talked politics, and laughed and joked, like any other persons. This is the whole extent, and it looks like arrant trifling, unless more were proved. It may show, that being thus together, and knowing each other, they could appoint meetings somewhere else, to form a conspiracy, if so disposed; but it does not even tend to show that they were so disposed, or did meet elsewhere, or did conspire. I would refer you, as a specimen of this whole class of witnesses, to L'Hommedieu, the president of a bank, who came all the way from Cincinnati to testify, that while boarding at the Walnut Street House, he saw three or four of these defendants, talking together three or four times—two certainly—exactly as they talked with all their acquaintances, and as all other people talk together.

Motives—When a great crime is charged, we naturally look for an adequate motive; and where several persons are charged with committing it, we expect an equally powerful motive as to all. This proceeds upon the idea that the veriest human monster, not absolutely insane, will not gratuitously and in mere wantonness, commit a great crime. Now the only motive here presented is, gain by false insurances—and this could only apply to those who had effected insurances either wholly fictitious or greatly overvalued —and could not apply, either to those who had no insurance, or had insurance under the actual value; because they must inevitably be losers by the destruction of the boat. And we submit that there is no sufficient proof that any one of the defendants had an insurance wholly fictitious, or overvalued. At the very most a suspicion only is created in any instance: and although it is impossible, generally, to prove a negative, we expect to come so near to it, as to remove any suspicion which has been thrown over these insurances.

As to the insinuation that here was a joint stock concern, or co-partnership, in which all were to share the gains in some agreed propositions, it is a mere insinuation, unsupported by a particle of proof. There is no evidence which even tends that way.

Purchase of the boat.—It is claimed that this was the first overt act in pursuance of a conspiracy, previously formed. But we expect to satisfy you, that in this there was nothing in the slightest degree suspicious—that Cummings was the sole owner, though Choate's name was used, to avoid a seizure at New Orleans—that he paid $9,000, which was all the means he had, and raised at the moment with no small difficulty—a difficulty which all the alleged conspirators together could not have experienced—that the value was less than first asked, and not an extravagant one—that the season was one of the best, and she would probably have paid for herself in three or four trips—that so far from being consummated in a hurry, the negotiation was postponed for one whole trip, to get the means together, and, in short, that every thing connected with the purchase, had the appearance of a fair business transaction—and so with the insurance. The boat was only insured for half her cost, $4,500, and the freight list for about two-thirds, or $2,500, which last would have been considerably less, but for the advice of McGregor and Choate.

The alleged false shipments.—The proof by the government is wholly of a negative character. Dealers in leather do not believe Filley & Chapin had 200 sides of white sole leather; nor dealers in sheepskins that they had 1,600 dozen of them. Those who casually visited their store and factory, do not believe they had so many boxes of boots, &c., as purport to have been shipped. McGrew and his son think Edwards must have been a pauper dependent upon Stephens, and Stephens an adventurer without much means. These are fair specimens of this whole class of evidence. Now, we expect to meet this negative testimony, as to all who are here upon trial, by positive evidence that the goods were there. In this we shall not assail the veracity of the government witnesses, because they swear to no facts. But we shall satisfy you that one affirmative is worth a hundred such negatives. With respect to Filley & Chapin, we do not deny that they were attempting to place their property beyond the reach of their creditors. This, though not proper, is what many men in failing circumstances have done before; and so far from tending to prove a conspiracy, it actually explains many circumstances which might otherwise appear suspicious. It accounts for the sale to Cole, their largest creditor, which was a real transaction. It accounts for their consignment to Kimball, and for the shipment by Adams Chapin. They were threatened with executions, and were determined to keep in their own hands the means of compounding with creditors. We do not contend that this was right, but we shall satisfy you that it was the fact. And, that in this view they did not regard a little loss by shipping to an Eastern market. To them it was not like sending coals to Newcastle.

The capacity of the boat.—Here again we shall array positive against negative testimony. We shall show that the boat was loaded to her utmost capacity; and that, too, by the advice of the pilot, that she might run better through the floating ice. We shall also show that her capacity was fully equal to all that was claimed to be on board, whether we regard weight or bulk.

Developments of the wreck.—It is claimed that as no remains of leather, or skins, or boxes, were discovered, they never could have been on board. If we had not positive proof to the contrary, as we have, this inference would not be justified, because we shall satisfy you of the probability, at least, that what was not consumed by the flames, was washed out and sunk, before the wreckers took possession. As to the conduct of Holland in leaving the wreck as he did, no one can blame him; and even if he deserved blame, it does not either make a conspiracy or prove one. The same remarks apply to Chandler, who received the savings by order of the captain, and offered to pay over the proceeds, but was refused. As to Holland, he certainly appropriated nothing to himself, but lost all. His life was threatened by those land pirates. He had no suitable clothing or shelter, and he could do no good by remaining. As to Cummings, he came to the wreck by the first boat, and did all he could through Taggart & McNeil. He put nothing in his own pocket, but simply made the things saved pay the salvage. The rest was placed in charge of Chandler, who is not here to answer for his conduct. He may have pocketed some of the savings, but this is no proof of a conspiracy. He certainly was not on or near the boat when burned, but came up with Cummings from New Orleans.

The suspected insurances.—I presume it is evident that no investigation was ever conducted with greater pecuniary means, or with more zeal, industry, and ability—which money can always purchase—than this. And yet, with all this outlay, there has not been discovered a single instance of double insurance, or a single instance of over insurance, or a single instance of simulated freight. By this last I mean, that nothing of cargo has been found which was not what it purported to be—no barrels or boxes filled with bricks, or stones, or scraps of iron, or sand, or any other false contents. Yet, any one who has read the cases of conspiracy to defraud, either by false shipments or false insurances, must be aware that these are the contrivances generally resorted to. While here, the insurances are either wholly real, or wholly

fictitious. There were no effigies. The goods were all there, or none there; and there was no seeming substitute. There was the actual thing, or nothing. This is one very remarkable feature of the case; and another is, that most of the insurances are proved by the government to have been real. The insurance on the boat was real, and for only half her actual cost. The insurance on the freight list was real, and for much less than its actual amount. Cummings would have had it about one-third, but was persuaded by McGregor and Choate to put it up to $2,500, which was still much below its real value. So the bar insured by Nicholson in his own name—not in the name of Laws, as was testified by Chew—was a real thing; and no one who has traveled on steamboats can doubt that $500 was a small valuation for the right to the bar, and the fixtures and liquors. Kissane's insurance was all the way to California—a useless waste, if the boat was never to reach New Orleans.. The same remark applies to the ample outfit of the boat, and the supply of wood immediately before the burning. Conspirators for money would have been more saving.

The letter of Kissane.—I trust you will read this letter very carefully, and more than once. I have done so; and it seems to me to be the natural outpouring of an almost broken-hearted, but innocent man. It has the hope and faith of an innocent man. Its caution to Nicholson, not to be arrested at present, and to take care of his papers, are justified by his own experience, when arrested, manacled, and searched, "like a dog," as he says; and by the public clamor then so rife against all concerned. Its reference to Pugh and Gallagher does not in any way implicate those gentlemen, and simply looks to a fair trial, conducted by a prosecutor not hostile, and before a jury not packed. Its reference to the Chapins, though not altogether kind, is entirely harmless, referring only to placing their property beyond the reach of creditors. In short, there is not a word in it which an innocent man, whether under accusation or not, might not write to a friend who was under such an accusation as this; or such a suspicion as is referred to in the beginning of the letter—I mean that of the forgery—which may have been the object of writing the letter. As to obtaining possession of this letter, it is manifest that he considered its interception an outrage, which justified its reception in any manner; and in this he will find many to agree with him. This violation of letters, for any purpose, is in itself a high crime.

Burning of the boat.—This is charged as the object of the alleged conspiracy. The boat was actually burned, and you are asked to infer that the burning was by design—that she was set on fire purposely, and in pursuance of a previous agreement. This is the whole strength of the case made by the prosecution. If it fails here, it fails altogether. But why are you required to draw this inference? Certainly not from the mere fact of burning. Hundreds of boats have been burned before, and the same boat has been on fire fifty times in a year—so says Captain Irwin—and no such inference was drawn. But it is said the circumstances indicate design; and I admit that if this be so —if this boat was designedly and not accidentally burned—then some of these defendants ought to be convicted; but, on the other hand, if this boat was accidentally and not designedly burned, then there is not proof enough to create even a suspicion of guilt. Here, as I said, is the turning point of the case. Now, no eye saw how the fire originated. The evidence is wholly circumstantial, and the conclusion must be drawn from a comparison of probabilities. The time was shortly after midnight. The weather was the coldest ever known. The place was the middle of the river, where the water was fifty feet deep, and the distance to the shore some 300 yards. That shore, too, was a steep, bluff bank, almost perpendicular, and with no shoal water. If the tiller rope should take fire, the boat would never reach the shore. If it did reach the shore, there was no place for fastening, and she could not be stranded. If any should plunge into the river, to save themselves by swimming, they must be chilled instantly. In a word, when the fire was first discovered, the probabilities were a hundred to one, yes, a thousand to one, that not one soul would escape. Nothing but the wonderful self-possession and precaution of the pilot—first, in turning the boat to the shore when he smelt fire before he saw it; and secondly, in directing the engineer to keep one of the engines working after the boat reached the shore, in order to keep her there, when she could not be fastened, because the rope was frozen—together with the blessed escape of the tiller rope from the rapid flame—nothing but this saved one soul from perishing. Besides, if the boat was to be burned, there was no occasion for doing it then and there, but everything—even the horrors of suicide and murder—suicide of the three conspiring officers, and murder of all the rest, passengers and crew—against the selection of that time and place. The boat had just wooded; been locked to the shore for nearly an hour. Why not fire her then; when all the persons who might detect the act were busy on shore, and when every soul on board might escape? Why so uselessly heap up crime; murder upon arson, and both upon conspiracy? Why create the necessity of those heroic acts, by which, after the burning wreck reached the shore, the captain and mate would have lost their lives, but for the accident of a skiff from a flat boat coming to their deliverance? Why play a game of hazard against such tremendous odds? Why not avoid gratuitous murder, which was committed if they burned the boat, and motiveless suicide,

which was in the highest degree probable? We expect to satisfy you, beyond all doubt, that the burning was accidental, and that there was not even a rumor of suspicion to the contrary, until got up by the insurance companies long after.

*The absence of three of the accused.*—The government endeavors to make something out of the fact, that three of the accused are not here to stand their trial. Stephens has never been arrested, and we know not where he is. Chandler was arrested, but discharged upon the preliminary examination, and not again arrested. We know not where he is. So that neither of these can be truly said to have absconded. Nicholson, it is true, has forfeited his bail, and we know not where he is. But, as to these three, we assume these positions: First, the other defendants, who are here, are in no way responsible for their acts, any further than they are, by other evidence, connected with them; and, secondly, as a consequence of the first, they can not be expected to explain those acts. It is enough for them to be required to explain their own, or such of them as are susceptible of explanation. But acts, in themselves innocent, require no explanation. And as to the acts of the absent, it is enough to say, that any explanation by us is not to be expected, for want of the means of information. It would be requiring us to do the impossible.

*The presence of nine of the accused.*—If the absence of three of the accused affords any presumption against them, then the presence of the nine affords an equally strong presumption in their favor. We expect to show you that long before their first arrest they were apprised of the suspicions whispered against them, and might have fled without involving bail. That Holland, hearing of the arrest of others, gave notice where he might be found and arrested. That Adams Chapin, Rufus Chapin, and Kimball, never were arrested, but voluntarily surrendered themselves. That all the nine, except Kissane, have been on bail ever since, and he remained on bail until reasons not connected with this case, recently deprived him of this privilege. Yet these nine, with the most ample opportunities for escape, are all here to meet the gravest charge ever preferred against men. And because they are here, under these circumstances, we claim for them the benefit of the very strong presumption thus created in their favor. For, unless conscious of innocence, why are they here?

*Combinations against them.*—We expect to satisfy you that the merit of standing trial, although conscious of innocence, is greatly enhanced by two considerations. In the first place, a large and influential portion of the press—not all, for there have been some noble exceptions—has, from the first hour of arrest up to this hour, pursued them with a malignity and pertinacity wholly un-

exampled—piling up surmise upon surmise, rumor upon rumor, and falsehood upon falsehood, day after day, and month after month, until a public opinion has been manufactured which might well appal the stoutest heart. That this persecution has followed them into this very court-house, and poured forth its venom upon court and counsel, for the sole reason that in order to secure a fair trial, these poisoned influences were excluded from this room; yet these men thus hunted down and pre-condemned, are, nevertheless, here. In the second place, there is a combination back of these newspapers, not a whit less, but even still more formidable—a conspiracy among numerous corporations, wielding millions of capital, and reaching all over the Union, to procure the conviction of these men—some of them too poor to pay either counsel or witnesses; in pursuance of which conspiracy, venal newspapers have been subsidized, and agents of all sorts from respectable down to base and basest, hired at large expense to effect their purpose. Yet, these men, who might have been elsewhere, have dared to defy this tremendous moneyed power, exerting itself through these most formidable agencies. Why have they not long ere this placed themselves where no extradition treaty could reach them?—as, indeed, the district attorney, at the last term, predicted they would—and said that nothing short of Omnipotence could keep them here, if out on bail. Yet these men are here!

*Sueing the insurance companies.*—Much stress appears to be laid on the fact that, in every instance where the insurance money has not been paid, suit has been brought. We expect to satisfy you that this is a circumstance wholly in our favor—that it is precisely the course which honest men would and do take. Had they refrained from prosecuting when payment was refused, and the reason stated, viz; the intentional burning of the boat, it would have looked as if they feared to face an investigation. But, by commencing suits, and thus defying the insurance companies, they have either exhibited a foolhardiness which is inexplicable, or a consciousness of innocence which is irresistible. No one can doubt that if these claims had been given up, this prosecution would never have been gotten up. This is manifest from what transpired at the meeting of the underwriters, as testified by Choate. All they wanted was to avoid payment. Public justice was nothing to them then, and they even now say they have been opposed to this prosecution.

*Conduct of the defendants.*—The general character of the defendants has not been put in issue, and is not therefore a subject of comment. But their previous position in society, and their conduct generally, from the time when the conspiracy is alleged to have been formed, up to the present moment, are in issue, and are fair subjects of proof and comment; and in this connection I desire

to call your attention to several points. Most of them are heads of families, occupying respectable positions, and for whom they reputably provide,—and have wives and children who love and depend upon them. Most of them have been engaged in regular business, which they have pursued attentively and industriously, until they came to meet you here. In their transaction of business, connected with the lading of this boat, there are some matters which the government thinks suspicious; but so do not I. For instance, Kissane, without any disguise of handwriting, or otherwise, filled up some of Cole's invoices, he being better acquainted with such transactions, and having made sales to Cole. So Cole used Filley & Chapin's blanks, after his purchase, striking out their names, and inserting his. In like manner, some of Smith & Kissane's blank bills of lading were used on this boat for other persons, by striking out their names, and inserting others. Now, these things are precisely what conspirators, watchful to cover up every track, would not have done; and yet precisely what innocent men, thinking no evil, and therefore taking no precaution, would be very likely to do. And the same remark applies generally to the perfect openness and apparent unconsciousness which characterize all their conduct. It is to be remembered, that from a period not definitely fixed, but certainly anterior to the purchase of the boat, according to the hypothesis of government, each of these defendants had become the depository of a guilty secret—a horrid and horrible secret—one which the human heart was never made to hold—which would struggle for utterance continually—through every word, and look, and act, and if the possessor were one instant off his guard, must and would betray him; and yet, although by the most wonderful retrospection ever brought to bear upon the past, the behavior of these men during that awful period has been scrutinized, as it were, with an universal eye, not one word, or look, or act, has been discovered which indicates the hiding of so tremendous a secret. Think of this, gentlemen, more especially after the boat had started—could those who were left behind, in dread suspense, sleep as usual, eat as usual, or work, or talk, or act, as usual? It is not possible. The good God never made his creatures to be capable of such "seeming."

But this is not all. The boat was burned, many of the insurances paid, and then suspicions were excited. At first they were only whispered in the secret conclave of the underwriters. To that they were to be confined, and the conduct of the suspected most carefully and secretly watched. But there was one noble-hearted man—himself afterwards most treacherously charged, and then discharged—I mean Capt. Choate—who demanded an open proceeding by arrest, or he would make known the secret charge. The open proceeding was declined, and he did make known the accusation and machinations of this conclave of underwriters, of which one Mason was the most prominent actor. The first result was that Cummings chastised him. This would be the first impulse of an innocent, but the last of a guilty man. If the accusation was false, the verdict of every manly heart would be, "served him right." Most innocent men would right such a wrong in some way or other. They chose this way. But I am not here to defend the charge of assault and battery. However much Mason was battered, he has his remedy elsewhere. What I wish you to observe is, that from the moment of the first promulgation of suspicion—nay, from the moment it came to be secretly entertained, down to this moment—the conduct of these men has been watched with more than the eyes of Argus—not by retrospection, as before, but by direct and most concentrated vision. And yet I aver that since that time, and down to this, there is not one look, or word, or act, of any of the defendants here on trial, which is not consistent with perfect innocence. If there be, you will be able to put your finger on it. But I am entirely confident that their behavior will stand the severest scrutiny. They have not behaved like guilty men, and do not now behave so. I am satisfied that you must have expected to meet a very different sort of men, when you came to try so grave a charge.

General aspect of the evidence.—I think, gentlemen, that you must have been disappointed, as I certainly have been, in the kind of evidence upon which you are asked to find a verdict of conviction. The learned counsel has repeatedly said in your hearing that the evidence would "grow up" as the case progressed. I presume he meant as "tall oaks from little acorns grow." We have had enough of the little acorns to plant a forest, but I can not see one of the tall oaks. It seems to me that the spirit and vigor of the attack have not at all come up to the lofty phrase of the manifesto. Considering the long time for preparation, the vast expenditure of money and labor to get up the case, and the consummate ability of all sorts employed, to say nothing of some of the means—I say, considering all these things, it would not be unreasonable to expect some very clear and definite proof, both of the actual formation of the conspiracy to burn the boat, and of the actual burning of the boat by design, in pursuance of such conspiracy. For this conspiracy, as charged, is a very distinct and definite thing. It must have had a subject, object, and intent,—a beginning, middle, and end. Some one must have first suggested it to some other one, and he to another, and so on, until all were initiated as conspirators. There must have been a time, place, and manner of doing all this. And there must have been some momentous details to be arranged—as how many and who were to be let into the perilous secret.

Should passengers be received for gratuitous murder? Should cargo be taken on board for gratuitous destruction? To what extent should useless supplies be taken, or useless insurances be effected? When and where should the boat be burned, and who should apply the torch? All of these and many more details entered into the idea of this conspiracy, if there was one. And yet there is not a single item in this vast account as to which you have any definite proof. You can not say with whom, or when, or where the conspiracy originated, or how it was formed, or how it was to be executed. All is vague, shadowy, and uncertain. Instead of that clear light by which you might see the truth unmistakably, you are asked to grope along, through mist and fog, and feel your way from fact to fact, until you get through this "mighty maze," without a plan. You are asked to construe negative testimony into positive—possibilities into certainties—proof of what men could do, into proof of what they did—to supply from imagination what is wanting in the testimony—in short, to convict these men upon private suspicion and public clamor, all got up and fomented by interested corporations—bodies politic and corporate, but without souls. Are you prepared for this? I trust not, and I think the evidence now to be introduced will make clear the innocence of the defendants.

The witnesses for the defense were then examined in the following order:

Isaac Cough—Was the partner of Capt. Choate. He was asleep on the starboard side, in the front room. Looked over the larboard side when waked by the ringing of the bell and stamping of Capt. Choate, and saw the fire breaking up near the chimney. Went down on the derrick to the lower deck, where he found the hands in great confusion. Capt. Cummings was without a coat, exerting himself to the utmost to rescue the passengers. The cold was intense.

Mr. Williams—Was on board the Martha Washington in 1848 and 1849 as mate. The boat was apt to take fire. It was on fire fifteen or twenty times while witness was mate. The boat was liable to take fire on the larboard side from the chimney. Witness never knew a boat sink from overloading. The fires spoken of by witness generally took place from the chimney on the larboard side of the boat, the same where the fire occurred when the boat was burnt. The boat will carry 650 tons. On being cross-examined, the witness stated that in the last up-river trip of the boat, she took fire three times in one day, from the same chimney. This was on the Mississippi river under the command of Capt. Irwin. Never knew fire to take place on the starboard side from the chimney.

Andrew Wilson—Witness has been on the river since 1841. Has been a mate on other boats. The Martha Washington will carry 700 tons.

Jesse Campbell—Has been on the river ten or twelve years. The steamboat Charles Hammond is the same size as the Martha Washington. The Charles Hammond can carry 700 tons. After her guards are reached by the water, the Charles Hammond could carry 150 tons. Witness says it is a common occurrence for boats to take fire from the chimney. The Daniel Webster took fire from chimney, and thirty persons on board of her were lost. The witness was at the place where the boat was burnt. It was a most unfavorable place for landing. The banks were high and steep—in some places almost perpendicular.

John Bergamire—Witness was assistant engineer on board the Martha Washington. Was on her two months before as third engineer. Saw candle boxes piled up on deck on both sides—extended back to wash house on the larboard side. While fires were being made at the wharf in Cincinnati saw persons engaged in carrying sole leather on board the boat. The witness thinks from seventy-five to one hundred rolls were taken in, noticed or observed by witness. Witness don't remember that he ever saw a boat more heavily loaded than the Martha Washington. Was sleeping in the second room; was awakened by the cry of fire; saw fire on the larboard side; went down to the lower deck on the starboard side; jumped from the bow to reach the log in the river, which extended to the shore; did not reach it and fell into the river; the boat was some twenty or thirty feet from the shore; swam to the shore. The witness was cross-examined as to the sole leather. Did not count the rolls; estimated them.

Mr. Painter—The Martha Washington would carry 650 tons and upwards. Twenty tons in addition would have little effect. Witness has been a mate; says the mate directs the loading to be put on board. Fires on boats are common; generally from the chimney. The Charles Hammond will carry rather more freight than the Martha Washington.

C. E. Nourse—In December, 1851, the stock of Filley & Chapin was large; three rooms fifty or sixty feet deep; contained boxes filled with boots and shoes. The Chapins owned, as they said, $40,000 or $50,000 worth of stock. Witness advanced them money at different times. They owed witness between two and three thousand dollars. They paid him in March, 1852. Witness did not look into the boxes—they were piled upon each other. Chaney made the arrangement for loans, after Cole's purchase.

Mr. Titus—From the 26th December to the 6th of January, 1852, witness was through the houses of Chapins. Made an estimate of the stock at from $20,000 to $25,000. Witness had several conversations with Burton. He said he thought they would fail. Said they had sold their stock to Cole. They had stock in the second and third stories.

James F. Painter—Was mate on the Martha Washington four or five months. Has seen

the boat take fire around the chimney outside the casing; also from below. The Martha Washington could carry 650 tons; might carry more, but can't tell. Witness was never on a boat which was not liable to take fire. Tin cased the chimney, but it cracked in 1850, so that one could see on the bulkhead.

John Lynch—Was on the Martha Washington under Capt. Cummings as bar keeper. Is now employed on one of the Lake Erie boats. There were piled up in the social hall of the Martha Washington, boxes, rolls of paper, and brooms. The witness slept next door to the office. When he awoke the social hall was on fire. Witness knows Brown, owner of the America, on which boat witness is engaged on Lake Erie. Never told Brown he believed the boat was set on fire, nor that he could do the defendants no good. Never heard any suspicion expressed, about the time of the fire, that the boat had been set on fire.

Wm. Grady—Lives at St. Louis. Followed the river five or six years. He was pantryman on board the Martha Washington. Saw sole leather carried down about dark, before the boat left the wharf at Cincinnati. The leather was put down the hole. Boxes were piled up in and outside the social hall; paper bundles were laid on them, and brooms were laid on the paper. There was plenty of provisions on board for the trip to New Orleans. The boat was loaded within six inches of the guards. When witness first heard the bell he saw the blaze through the green slats near the chimney, extending to the social hall. These slats were on a false door on the larboard side. near the chimney. The witness says the blaze was through the slats, but the paper was not then on fire. Witness saw sheep skins piled up nearly to the roof. Saw delivered to the boat, at Cincinnati, three or four dray loads of white sole leather.

J. C. Waller—Witness lives near Louisville, Ky. Went down the river as a passenger on board the Martha Washington, on business, to St. Joseph. He slept on the second berth of the gangway; went to bed about eleven o'clock. Heard the bell ringing, and stamping on the deck, and a cry of fire. The boat was very heavily loaded—passengers complained of it.

John Snethen—Witness is a farmer. Was four years on the river, and was fireman on the Martha Washington the last trip. Witness saw leather brought on board at Cincinnati. in the afternoon and after night. When the alarm of fire was given witness went forward. Saw the fire at the chimney on the larboard side. He took the cable on shore; jumped to a log and fastened the cable to a tree. The boat was loaded very deep. Heard no suspicions that the boat had been set on fire. On cross-examination, witness was inquired of whether he had been with Clark, the attorney. Witness said he had been twice to see Kissane, but had not been with Clark. He saw white sole leather on board; was piled pretty nearly over all the freight. Sheep skins were stowed on deck, and in the hold. Hands sat upon the sheep skins—some of the firemen ate there.

Mr. McLaughlin—Witness helped load the boat; was hired for that purpose the 6th or 7th of January. Large quantities of candle boxes were brought on board, and also large quantities of leather in rolls—some of these rolls were put in the engine room, more in the hold. One hundred bales of sheep skins, more or less, were brought on board. The hands were loading the boat until eleven o'clock at night. On cross-examination, witness said white sole leather was put on board at Cincinnati.

Robert Lemon—In 1851 witness was employed by Filley & Chapin. The hands made a week from 100 to 150 pairs of boots; never less than from 70 to 75. The usual amount of sole leather on hand was from one to three thousand sides—kept in the second and third stories of the building occupied by them. In the stores the leather was kept in the cellar. They had an unusual quantity of calf skins. They had the largest stock he ever saw. The witness has been at Cincinnati four years. There were on hand twenty-five or more bales of sheep skins, and as much more stored. This witness prepared for the shipment, early in January, 1852. 200 cases of boots. The hands were busy in preparing the shipments. Remembers that the 200 cases of boots were let down from the second story of the building. Two persons nailed the boxes. Twenty-five rolls of sole leather were also let down. There was a much larger quantity in the cellar of the store. There were twenty-five or thirty bales of sheep skins at the factory. After the shipment there was very little of the stock left. There was nothing left in the Main street store. Mr. Chaney carries on the same business. One half the sole leather was white, or, at least, there was that proportion of white sole leather. On cross-examination, the witness says the sheep skins were brought down the river about the same time. Saw a man marking the boxes which contained the boots. Lyman Cole bought out the establishment about the middle of December.

Benjamin Earl—The witness has lived in Cincinnati nine years. Was the salesman of Filley & Chapin a year, and up to the sale to Cole. The firm owed witness five or six thousand dollars. To secure this sum the Madison policy was assigned to witness. Witness believes that by the sale to Cole, and the shipment, they intended to cheat their creditors. Witness having borrowed. on his own credit, $1,200 from Kissane, for Filley & Chapin, and to secure the payment. he assigned to Kissane. on the above policy, $1,500. When the loan was made it was to be returned in a few days. Filley & Chapin had borrowed money from Cole, and the sale was made to him to pay the borrowed money. Burton never went with witness through the rooms of the factory or other buildings occupied by the Chapins, and

if Burton went through the rooms it must have been after the sale to Cole. The Chapins had rising of twelve hundred sides of sole leather. They dealt largely in sheep skins. The shipments were made by the Chapins to get the money into their pockets. Kissane got boots from the company. The books of the firm were not kept as the witness would have kept them. Soon after Cole took possession, bought great quantities of sole leather, white and red. He remembers fifty bales were bought at once, which was the largest purchase at one time. Burton left the 182 dozen of sheep skins—took notes, which he was to protect, if skins should not be sold. Ninety-eight cases of boots the greatest number sent to the store in one week. There were employed in the establishment from 150 to 175 hands. Two hundred rolls of white sole leather (by drayman's certificate) and 1,600 dozen sheep skins were sent on board the Martha Washington. Ninety odd cases of boots and shoes were sent. Fifty cases were directed to Horace Cole, California. Two hundred boxes of boots were shipped for Adams Chapin from the factory. Witness did some of the marking on the above boxes on the sidewalk. Of the boxes letter C was marked shipped to Brownsville, Texas. A variety of hats, shoes, boots, &c., above seventy cases. Burton told witness that they (the Chapins) had offered him six or eight thousand dollars. Said he could get the money if he had the bills of purchase. Burton came into the store and said he had Filley's dying confession; that he would fix them. Witness replied that it was as false as hell; not one word stated by him (Burton) was true. Burton then said he was only waiting a telegraph to fix the irons on him. Witness (to use his words) told him that he was a damned old scoundrel, and observed to him, have me arrested. Witness then said he should do his duty, regardless of threats; that if the Chapins were guilty they ought to be arrested; and the witness further said he hoped if the boat was purposely burnt, the guilty persons would be punished. Afterward the witness went to the Dennison House with Burton. On their way he proposed if the witness would come out and show fraud he should have $2,500. Burton offered to secure him $2,000, and said he would set him up in business. That Carpenter would take him into partnership. On being cross-examined, whether he had not said to Dr. Case that he could send the Chapins to the penitentiary, witness replied that he could not say whether he had said so or not. He was also asked whether he had not said to the same person that the defendants had shipped to ——, of Texas, articles of no value. Witness replied he had not said so, and explained that articles had been sent to Texas which were not saleable in Cincinnati, and which had been purchased by Chapin in New York, and which were

saleable in Texas, particularly low quartered shoes for women, &c. Cole said he would sell on time. In regard to Stephens' purchase, witness says he became acquainted with him, and shortly afterwards he inquired for a room in which to deposit stores. Had no room. Stephens purchased between two or three thousand dollars worth. His boxes were marked G. P. S.; not positive there was an S.; directed to the care, the witness thinks, of some one in New Orleans; cases weighed about fifty pounds each. Cooley's shipment—witness says Cooley was not at Cincinnati at the time of the shipment. Horace Cole's shipment—brother of L. Cole, defendant: 200 bales of white sole leather were shipped. The leather was principally taken from the cellar under the store. The cellar was dark—the leather could not be seen except by candles. Sixteen hundred dozen sheep skins were shipped. Sold the red sole leather at Louisville. Three drays were loaded six or eight times with sole leather. The principal part of the sole leather was sent on the 7th of January, 1852. The sole leather was piled up in the cellar under the store, extending two sides and several rolls in depth. The assignment of the Madison Insurance office was dated back some twelve or twenty days. The sales of white sole leather were weighed. Some of it in the second and third stories of the factory, the other part in the cellar of the store. This he stated on cross-examination. Also, he said he never knew Filley & Chapin to purchase sole leather which was not in rolls, except leather brought to the factory or bought in the city. The marks on the boxes the witness has described as nearly as he can.

J. S. Oliver—Was in the employ of the Chapins. They had one hundred and fifty hands, and made between seventy-five to eighty cases of boots weekly, each case containing one dozen boots. In the cellar of the store, on the left hand as one entered, the white sole leather was laid five or six rolls high, and extended thirty feet. This was the cellar of the Main street store. Ladies' shoes were in boxes in the second story. In the third story there were hats. The witness speaks of the last of December, 1851, and the first of January succeeding. In the first story of the store there were boxes of boots and shoes. The store was about sixty feet deep; five or six boxes high extended round the room, 120 feet inside the elbow. The boxes contained boots and shoes. About the time of the shipment saw the hands lowering sheep skins from the store. On cross-examination, witness said he had been at the jail a number of times. When the shipment was being made, witness carried a message from Cole to Kissane, about shipping pork and lard that day on the Martha Washington.

George Burris—Witness is a ship carpenter. On the 14th of January, 1852, was on

a flat-boat near where the Martha Washington was burnt. This was near the foot of bend Sixty-five, on the Mississippi. Came near with the flat-boat while the Martha Washington was on fire; jumped into a skiff, and rowed round the boat. The wind blew from the Arkansas shore. The bow of the boat had been at the shore, but was floating out into the river. The flames caused witness to row off. Saw seven or eight men—some of them jumped into the yawl, and appeared to be greatly excited. Witness saw Capt. Cummings trying to climb up to the stern. Witness asked him to get into the skiff, which, after some time, he did. and witness took him to the shore.

Mr. Conine—Knew Capt. Cummings. Saw him on the Rio Grande. He was doing business as a merchant, and had a respectable establishment.

Capt. Kendrick—The Martha Washington was worth $10,000. The trip down worth at least $4,800.

Mr. Bruck—Purchased, at Cincinnati, flour, corn meal, and bread, amounting to at least $36.

John Henry—Lives eight miles from Cincinnati. Was fireman on board the Martha Washington. There were many boxes on board; white sole leather—does not remember the quantity of white sole leather. Witness helped load the boat: there was a large amount of sole leather; great numbers of boxes. Witness speaks of the burning as other witnesses. He fell into the river. Capt. Cummings pulled off his coat and gave it to him. Capt. Cummings went on board anxious to save some children that were on board.

Col. Austen—Knew Capt. Cummings in Mexico, selling goods. Saw him frequently.

Charles Smith—Also knew Capt. Cummings in Mexico—engaged in selling goods.

Mr. Huhilt—Witness lives in Newport, Ky. Engaged in freighting. The Martha Washington would carry from 650 to 700 tons. She was apt to take fire from her chimney. Witness has seen a boat loaded so deep that a current ran across her. Letters from New Bedford read, recommending the shipment of pork and lard to that place. dated 3d Dec., 1851.

John Myers—Shipped 125,400 cigars for California, the 7th January, 1852, on board the Martha Washington.

Andrew Lytle—Witness has been on the river since 1846. The Martha Washington will carry 650 tons, and 150 tons might be put on her after her guards touch the water. When the chimney becomes red hot the fire may be communicated to the bulkhead, through the case which surrounds the chimney.

Mrs. Thayer—Is sister to the Chapins. She left Massachusetts and arrived at Cincinnati on the 9th of January, 1852, with the intention to go down to New Orleans with Capt. Cummings, her brother-in-law. But the boat having left Cincinnati on the 8th, she did not go.

Mr. Kebler—Cole called, with Filley & Chapin, on the witness. The company were desirous to assign certain merchandize, a schedule of which was presented. Witness wrote a bill of sale, and filled up notes for the purchase money, after deducting between six and seven thousand dollars, the whole amount being eighteen thousand dollars. Cole came to the office and requested witness and Judge Walker, who practice in partnership, to garnishee Stephens' insurance. An attachment was issued, and the insurance company was garnisheed for the debt due by Stephens to Cole, for goods purchased from Cole. Some time after Burton came to the office to see paid the money on the insurance at New York by Kimball, and it was suggested that $8,000 be paid on that policy. Burton was anxious to get an assignment of the policy, so that he might obtain the money. Kimball refused to make the assignment. Burton sought evidence to show the fairness of the shipment. After Kimball refused to assign the policy, Burton said he did not believe the goods were shipped. Witness spoke often to Burton afterward respecting the matter; the shipment was made on the 8th. Burton said he arrived on the 9th, and was at Chapins' store and saw no such property as is alleged to have been shipped. Cole made insurance at a Detroit office, with the agent at Cincinnati. The agent would not settle unless an adjustment should be made. The assured were determined to prosecute. Suit was commenced on the policy; has been continued and not pressed. The branch of the office has been withdrawn from Cincinnati. Mr. Scarborough requested to see the books of the firm and papers. Witness offered the books which he declined. Afterward he called for the books, which witness refused to produce. White sole leather they got, as witness understood, down the river and from the canal, by exchanging made-up articles, &c. The witness stated the number of notes given by Cole on the purchase, and the notes being produced he identified them.

James Riley—The witness is second mate. The Martha Washington and the Charles Hammond are about the same size. The Charles Hammond carries seven hundred and twenty or twenty-three tons.

Lieut. Moore—Capt Cummings was engaged in the merchandizing on the Rio Grande.

Wm. Trumper—Saw Nicholson at the Walnut St. House. He was treated as a gentleman.

Mr. Defray—In 1852 was at the Walnut Street House. Saw nothing peculiar in Capt. Cummings, Nicholson and Kissane.

Mr. Duffler—Bought 1849 gallons of brandy. 13 casks for Kissane, to be paid for in candles, for which witness received five per cent. At Smith & Kissane's candle factory there were made daily one hundred boxes of candles.

Mr. Meader—Lives in Cincinnati. Is a creditor of Filley & Chapin. A person from Kentucky represented he had a large quantity of white sole leather to sell. The man said he

would ship it to New York if he could not sell it in Cincinnati. Witness directed him to Chapins, but does not know whether he called, nor whether they purchased his leather. Witness saw on the floor above the cellar many boxes. The weather was cold the latter part of December, so that the river was closed. Witness supposed the goods on hand amounted to between twenty and twenty-five thousand dollars.

Mr. Cliff—Was drayman on the 7th of January. Hauled six or seven boxes of cigars, and brandy to the Martha Washington, from Kissane's factory. Also candle boxes and lard in barrels. He was engaged in hauling as much as four days. At the same time two other drays were employed in the same business. Twelve hundred boxes of candles were hauled from the same place to the Martha Washington, and 13 casks of brandy.

F. Gilgress—Lives in Cincinnati. Is a drayman. Hauled one cask of brandy; also two other casks to the Martha Washington. This was about dark on the 7th of January. Hauled boxes for Filley & Chapin—fourteen perhaps more. Knew another person that hauled boxes of candles. Hauled also from pork house to the Martha Washington. Three or four other draymen were also hauling lard oil, &c., and candle boxes for Kissane to the Martha Washington.

John S. Powers—The witness was flour inspector in Cincinnati in the fall of 1849. He knew Horace Cole. Was one of the deputy sheriffs at San Francisco. Has a strong likeness to his brother, Lyman Cole. Witness was acquainted with Perkins, firm Perkins & Ingart. Witness returned from California July 7th, 1851. Kissane told witness he was desirous of shipping goods to California to his old friend Perkins. Witness advised him to ship boots of a certain kind, called Hungarian boots, and shoes. This was in the fall of 1851 and January, 1852. About New Year the river opened. From the 5th to the 7th of that month noticed a large amount of shipping going on. Lard and pork and candle boxes. Understood from the defendants that they were shipping by the Martha Washington lard oil, in addition to the above. Witness saw half a dozen drays at Kissane's pork house, and also the same number at the candle factory. Boots sold in California at $48 per pair. Kissane shipped 300 bbls. mess pork, 600 boxes of candles, and 600 boxes again of do. Witness saw the bill now in evidence torn from the book. It contains 13 casks of brandy, 6 boxes of cigars, 155 boxes of boots, &c. The above were shipped to California. Letter handed by Kissane to Lawrence, introducing Capt. Cummings to Smith & Kissane. After the boat was burnt heard Kissane regretted it very much, as if his goods had gone to California he would have done well.

A. M. Holman—In 1851 witness was employed by Filley & Chapin, and afterwards was employed by Chaney. He took to Lexington a large number of boots and shoes, and sold them. He was never on board the Martha Washington. Witness swore to certain papers, does not now know what.

John Arnet—In 1851-2 witness worked in Kissane's candle factory. From 75 to 100 boxes of candles were made a day. Lard oil and red oil were also manufactured. Remembers the Martha Washington was burnt. There was shipped from 1,000 to 1,200 boxes of candles, 400 or 500 barrels of oil. Seventy-five barrels of oil made a day. Three hundred sheep skins in one tank. Had four tanks. Sometimes they killed two thousand hogs a day; at other times two or three hundred. The witness says there were shipped from Kissane's establishment 1,200 boxes of candles, 400 or 500 bbls. of lard, 200 bbls. of lard oil, about New Year's.

Charles Matthews—Is a teacher in Cincinnati. By accurate measurement the Charles Hammond will carry 796 tons.

Philip Patt—Witness worked for Smith & Kissane. In the early part of January, 1852, candles were shipped. Nailed up the boxes, but can not state the number of them.

John Owens—Is a drayman. Nine drays engaged with witness. Three hundred boxes of candles; witness got the tickets. This was late in the evening (near supper time) on the 7th of January, when the boxes were delivered on board the Martha Washington.

Wm. Mowry—Is a plasterer. The first week in January, 1852, met Anderson, a drayman, hauling boxes and barrels, several days. There were engaged with him ten or fifteen drays. Anderson said they were hauling for Kissane to the Martha Washington. This was objected to as the mere statement of Anderson. THE COURT admitted the evidence as competent; was a part of the res gestæ, when the work was being done, and when there could have been no motive to misrepresent.

John Arthur—Lives in Cincinnati. Kept two drays four or five days engaged in hauling to the Martha Washington from the different pork houses. Eight or nine drays went down the last load to the Martha Washington. This was in the evening.

James Burns—Lives in Cincinnati. Was draying for Thos. Anderson. Hauled from the candle factory. Kissane had fifteen or twenty drays. Three or four loads, perhaps more.

Daniel Sheets—Is a drayman. Hauled 5th of January from candle factory, one load of lard oil

Patrick Crow—Is a drayman. Hauled lard from Smith & Kissane's steam house. Oil one load. Three or four others.

Thomas Bradley—Is a drayman. Hauled one load same time with Crow from Kissane's steam house.

Martin Reese—Drayman. Hauled for Anderson to the Martha Washington from Kissane's factory.

Henry Neiter—Is a cooper. Made for Kis-

sane & Smith five or six hundred pork barrels the latter part of December, 1851.

Patrick Keeley—Worked in Smith & Kissane's pork house in January, 1852. Many barrels of pork were shipped.

William Kirkpatrick—Good pork was packed at Smith & Kissane's pork house.

Smith Anderson—From fifteen to thirty drays were employed in hauling for Smith & Kissane articles for shipment in the fore part of January.

A. C. Cooper—Lives in New Harmony, at Mt. Vernon, Ia. Hailed the Martha Washington as she descended the river, when she came to. Witness wanted to freight twenty-five tons and upwards. The boat was heavily loaded; water run on the lower deck. Capt. Cummings hesitated whether he would take any more loading. Went on the upper deck, returned and said he would take it. Went some miles below and took on board 1,000 bags of corn. Was the last loading taken on board. After midnight on the morning of the 14th of January, while in his berth, witness heard the bell ringing violently. Sprang out of his berth, ran into the ladies' cabin, met the chambermaid, who appeared to be stupefied, and said nothing. Saw Holland, the mate, immediately after, who was knocking at the doors of the cabin and crying fire at the bow. Witness returned to his berth, snatched up a part of his clothes, retreated to the starboard side, got on the lower deck, and saw the blaze in the social hall. The fire seemed to run through the boat as lightning. Witness saw the boat was nearing the shore. He stood on the lower deck and was the first or among the first to jump to the shore. He ran up some distance on the land as he was apprehensive that gunpowder was on board. He returned to the fire. Capt. Cummings was there, without a coat, raising his hands and exclaiming, "O Lord! where are the children?" He was greatly affected.

Moses Parmely—In January, 1852, was engaged in draying. Saw Anderson's drays delivering pork, lard and lard oil. A great deal of loading was on the wharf near to and opposite the Martha Washington.

E. J. Wood—Witness knows Anderson was draying for Smith & Kissane. He employed a great number of drays on an emergency.

Samuel Bebee—Draying in Cincinnati. Draymen exchange works in cases of emergency. Witness hauled four loads from the factory of Kissane to the Martha Washington shortly after the river broke up.

Thomas Anderson—Followed draying in 1852. The principal house he drayed for was the house of Smith & Kissane, and McGill. He hauled twelve hundred boxes of candles from the candle factory to the Martha Washington. He had some eleven or twelve drays under his direction. Hauled two hundred barrels and tierces of lard, also three hundred bbls. and tierces in addition, two

hundred and fifty bbls. of pork, from the pork house. Six or seven days drays were engaged in hauling. Three hundred bbls. of pork were at first directed to be hauled to the Statesman steamboat. It refused to take more freight. The witness was then directed to haul the same to the Martha Washington. Fourteen casks of brandy, 250 bbls. of pork for Cole were hauled. Saw the boxes, &c., at the Martha Washington, being loaded. Also, there was hauled to the same boat, 300 bbls. of beef, in doing which witness was not employed.

Henry Chapin—In January, 1852, witness went to the 4th story, with his uncle, Rufus Chapin, where he saw ten or fifteen bales of sheep skins let down, which were sent on board the Martha Washington. There were no other skins at that time in fourth story. Witness knew other skins had been there and had been removed.

Mr. Powers—Has made a strict calculation of the measurement of the freight on board the Martha Washington, which amounted to 720 tons; and he has measured the capacity of the boat, according to the most approved rules of measurement, and he finds that the boat could carry from 30 to 50 tons more than was on board of her.

Mr. Riddle—Stated that a short time after this case was heard by the commissioner, before whom Burton was sworn as a witness, and who testified that he had received no compensation and expected none for his efforts in relation to this prosecution, Burton said to witness, in a conversation, afterward, that he did not expect to lose a dime. Witness understood him to say that he expected to be saved from expense by the insurance offices.

Mr. Brown—Several packages of sheep skins being brought into court, the witness stated that No. 1, 9 lbs., 16 dozen in a bale, which would weigh 144 lbs., and which multiplied by 100, would make 14,400 lbs., being 7 tons.

Rebutting evidence was called by the prosecution.

Dr. Kates—Lives in Cincinnati. Is acquainted with B. Earl. He frequently said to witness that the Chapins were all concerned, and that he could send them to the penitentiary, and would do so. The witness was asked by a juror as to Earl's general character for truth, and he answered that he had never told him a falsehood.

B. Earl—Being called and examined in relation to the statement made to the above witness, states that he had borrowed money from Dr. Case for Filley & Chapin—some two hundred dollars. The witness was engaged to be married to a lady in the East, and was obliged to postpone it, because he could not get money from Filley & Chapin which they owed him. That at this disappointment he was displeased and disappointed, and if he made the threat against the Chapins, as stated by Dr. Kates, it was in ref-

erence to the conveyance of their property to defraud their creditors, which he supposed was punishable. Witness had been in the practice of borrowing money for the firm.

Mr. Barnum—Being called by the prosecution, was asked in relation to Burton's general character for truth and veracity.

The defendants' counsel objected to this evidence on the ground that the general character of the witness had not been assailed. By the prosecution it was insisted that general character for truth may be given in evidence, where proof has been given of contradictory statements made by a witness. THE COURT admitted the evidence. The witness stated that he knew nothing against the truth of Mr. Burton, and would believe him under oath. To the same import were the statements of Mr. Hughes, Mr. Powell, and Mr. Paine, all of whom are acquainted with the witness, and some of them live in his neighborhood.

Several of the defendants' witnesses, when called, were asked by the prosecution whether they had been examined by Clark, and their testimony taken down and signed by them. These questions were objected to by defendants' counsel. They avowed the fact that Clark, being one of the counsel of the defendants, had been requested to ascertain the facts within the knowledge of the respective witnesses, in order that they might be classified, and called so as to produce to the court and jury a connected relation of the facts. And they alleged that the counsel concerned in court, from the great number of witnesses, could not ascertain the necessary facts so as to examine them intelligibly. And they insisted on the right, as professional men, to understand from the witnesses to what points they could testify. The prosecution alleged that it was training the witnesses, and would necessarily influence them favorably for the defendants.

THE COURT directed Clark to be called, and being sworn, he stated that being a member of the bar, and employed as counsel for the defendants, he had taken down the statements of facts to which they would testify, from several of the witnesses, which they had signed, and which statements he had given to the defendants' counsel, in order that they might know how to call them for examination. He further stated that he had asked the witnesses no leading questions to influence their statements, but had put down on paper what they said voluntarily. That in two or three instances these statements had been taken down in the presence of two or three other witnesses.

THE COURT remarked that they could not control the intercourse between the defendants' counsel and their witnesses, unless they have been guilty of unprofessional conduct. That they supposed it was not improper in counsel to ascertain from the witnesses, facts, especially in a case like the present, where hundreds of witnesses were in attendance, that they might shorten the examination by calling the witnesses who had a knowledge of the same facts. The witnesses, or at least many of them, had been examined before the commissioner originally, their testimony taken down and published in a book, which is in the hands of both parties.

THE COURT further observed, that under the circumstances of the present case, they would direct the counsel, Clark, not to take down the statements of the witnesses, and no further statements were taken, known to the court, except a short one by one of the counsel engaged in court, which was presented or offered to be handed to the opposing counsel, but was waived by them, no objection being stated.

The testimony being closed, the counsel for the prosecution asked the court to suspend further proceeding in the case until the arrival of rebutting witnesses, which they expected from Cincinnati. That they had requested the witnesses by telegraph to come, and they were expected. This was about twelve o'clock, the usual time for adjourning the court, and the court observed that they could not suspend the proceedings in the case on account of the absent witnesses. And they stated that public notice had been given, in open court, before the adjournment of the court the day before, that the defendants would close their testimony by twelve o'clock the ensuing day, which afforded ample time to bring the witnesses. That one train of cars, after the notice, on the same evening, passed down to Cincinnati from Columbus, and that two trains of cars had arrived that morning from Cincinnati, in either of which the desired witnesses might have come. That no other train would arrive until after dark, and that as the witnesses had not come in the morning trains, it was not certain that they would be up in the evening. That three weeks had been taken up in the examination of the witnesses, and that the cause could not be suspended under the circumstances.

Other objections might have been added, as a reason why the case should not be delayed. If the witnesses were summoned and were paid by the government, unless their absence was with the consent of the prosecution, a motion for an attachment should have been made, on which the court would, as a matter of course, delay the cause and send for the witnesses. The witnesses were not absent with the consent or knowledge of the court, but if the prosecution permitted them to be absent, they were not liable to an attachment, as they were not absent in contempt of the process of the court.

Before the examination of the witnesses for the defendants commenced, on their being called to be sworn, it was distinctly announced in open court, by one of the counsel for the defendants, that only such of the

witnesses would be examined as were most important; and that they were called and sworn that their per diem might be allowed them. And on the same day, before a witness was examined for the defendants, the leading counsel for the defense, in the presence of the presiding judge, observed to the leading counsel for the prosecution, that they would not take up more than a week, as they should examine only their important witnesses. And during the recess of the court, at twelve o'clock, the day before the testimony closed, in conversation with the presiding judge, in the presence of the leading counsel for the prosecution, the counsel for the defendants observed that they would close the testimony by twelve o'clock the next day. This is admitted by the leading counsel. The witnesses were telegraphed, but failed to come. There was time to have brought the witnesses more than three times the distance of Cincinnati.

There was no intimation made to the court on the part of the prosecution, that the rebutting evidence was material in the case, nor to what facts or persons it could apply. Nor was there any suggestion of surprise by any of the facts proved. There would seem to be no ground for such a suggestion, as the testimony of all the principal witnesses had been written down before the commissioner and published, and during the trial was in the hands of the counsel on both sides. These circumstances, connected with the extraordinary effort and ability with which the cause had been prosecuted by the counsel who represent the government, induces the court to believe that the evidence referred to could not be deemed important.

But, in addition to all these considerations, no court, except under very peculiar circumstances, could permit the proceedings to be suspended. If the prosecution is to be indulged to send for witnesses, after the close of the testimony, the defendants could claim the same privilege, and this would extend the investigation for any length of time the parties might desire. No such rule has been recognized by any court.

At the meeting of the court in the afternoon, Mr. Morton, the district attorney, commenced his opening argument, and continued it that afternoon and the following day. After the close of his argument, Mr. Ewing, in the defense, made known to the court, that they would submit the cause to the jury, without argument, on the charge of the court.

Mr. Stanbery, on the part of the prosecution, stated to the court the submission was altogether on the part of the defense; for the prosecution they desired to argue the case.

THE COURT observed that they regretted the course, in this respect, of the counsel in the defense. That the court could not control the counsel in the discharge of their duties to their clients. But when no argument has been made in the defense, and the prosecution, by the district attorney, has had a full opening, commenting at large on the testimony, which occupied the court a day and a half, further argument on that side could not be heard. The court said that they would charge the jury the next morning.

McLEAN, Circuit Justice (charging jury). The indictment in this case is found under the 23d section of the act of the third of March, 1825. It provides, "that, if any person or persons shall, on the high seas, or within the United States, willfully and corruptly conspire, combine and confederate, with any other person or persons, such other person or persons being either within or without the United States, to cast away, burn, or otherwise destroy, any ship or vessel, or procure the same to be done, with intent to injure any person or body politic, that hath underwritten or shall thereafterward underwrite, any policy of insurance thereon, or of goods on board thereof, or with intent to injure any person or body politic that hath lent or advanced, or thereafter shall lend or advance, any money on such vessel, on bottomry or respondentia, or shall within the United States, build or fit out, or aid in building or fitting out any ship or vessel, with intent that the same shall be cast away, burnt, or destroyed, for the purpose or with the design aforesaid, every person so offending shall, on conviction thereof, be deemed guilty of felony, and shall be punished by fine, not exceeding ten thousand dollars, and by imprisonment and confinement to hard labor, not exceeding ten years."

The defendants are charged with having wilfully and corruptly conspired to burn and destroy the steamboat Martha Washington and her cargo, with the intention to injure certain underwriters who had insured the same. Two or more of the defendants must be found guilty, or the conspiracy charged will not be established. To consummate the offense, under the statute, it is not necessary to prove that boat was burnt, or that the insurance offices were injured. It is enough to show that the defendants conspired to destroy the steamboat, with the view of injuring those offices. A conspiracy is rarely, if ever, proved by positive testimony. When a crime of high magnitude is about to be perpetrated by a combination of individuals, they do not act openly, but covertly and secretly. The purpose formed is known only to those who enter into it. Unless one of the original conspirators betray his companions and give evidence against them, their guilt can be proved only by circumstantial evidence. This kind of evidence often satisfies a jury of the guilt of the accused. But in such a case the circumstances must be so strong as to be inconsistent with the innocence of the accused. It is said by some writers on evidence, that such circumstances are stronger than positive proof. A witness swearing

positively, it is said, may misapprehend the facts or swear falsely, but that circumstances can not lie.

The common design is the essence of the charge; and this may be made to appear, when the defendants steadily pursue the same object, whether acting separately or together, by common or different means, all leading to the same unlawful result. And where prima facie evidence has been given of a combination, the acts or confessions of one are evidence against all. This rule of evidence is founded upon principles which apply to agencies and partnerships. And it is reasonable that where a body of men assume the attribute of individuality, whether for commercial business or the commission of a crime, that the association should be bound by the acts of one of its members, in carrying out the design.

To sustain the prosecution the conspiracy must be proved, and that it was entered into to injure the underwriters. This it is insisted has been done: (1) By evidence showing prima facie, that the defendants being known to each other and associated in this enterprise, formed the combination as charged. (2) By using false bills of lading and invoices. (3) By obtaining insurances thereon. (4) By representing a greater amount of tonnage on board the Martha Washington than its capacity could carry. (5) By burning the vessel.

That the defendants have endeavored to recover the insurance money, is not controverted, nor that the boat has been burnt. The destruction of the boat is not punishable under the act of congress, but if it appear from the evidence that it was destroyed by the defendants, or by one who had combined with them, it is strong, if not conclusive proof of a conspiracy to do so. So if it appear that the bills of lading were false, it shows a combination to injure the underwriters. Stephens, Nicholson and Chandler are included in the indictment, but they are not parties to this proceeding; still, if they entered into the conspiracy with the defendants their acts and confessions while carrying it out are evidence in this case.

It appears from the evidence of Robert McGrew, who keeps a boarding house on Seventh street, in Cincinnati, between Main and Walnut, that Stephens, Holland, and one Edwards, boarded with him—that Cole, Capt. Cummings and Kissane called to see them occasionally; and from their conversations it appeared that they became acquainted with each other on the Rio Grande. That Cole and Holland had been engaged in running a boat on that river. They had no private conversations to the knowledge of the witness, but appeared to be ordinary visitors, sitting in the public room. In the winter of 1851, William Northrup, who lives in Cincinnati, saw Kissane, Cummings, Cole and Nicholson frequently together. Mr. Penniman saw Nicholson in the fall of 1851, at Maysville,

who said he was on his way to the Esculapian Springs, in Kentucky, to visit his family, before he left on the Martha Washington, which boat he had purchased. Other witnesses proved that the defendants above named associated with each other, and that they were intimate with the Chapins. Mr. McGregor sold to Capt. Cummings the steamboat Martha Washington, which was owned by the witness and the Messrs. Irwin, for $9,000, which sum Capt. Cummings was to pay on her return trip. The insurances charged to have been made on false bills of lading and invoices, will now be stated with the evidence applicable to the same. Wm. Kimball, of New York, insured in the Union Mutual Insurance Company of the city of New York, $5,200 on leather, and $4,800 on sheep skins. This insurance covered two hundred rolls of white sole leather, and sixteen hundred dozen of sheep skins, which it is alleged were transferred to him by Filley & Chapin, in December, 1851. In the same month Lyman Cole is alleged to have purchased from the same firm boots and shoes, amounting to the sum of $18,000. The consideration is represented to have been borrowed money in part, and for the residue notes were given, which are in proof. Cole claims to have shipped two hundred and fifty barrels of mess pork, two hundred tierces of lard, ninety-seven cases of boots to Cooley, fifty-four cases of boots to Horace Cole. Adams Chapin claims to have shipped two hundred cases of boots.

Several witnesses have been examined to show that Filley & Chapin, or Cole, their assignee, had not the articles in their store stated in these bills of lading.

Mr. Burton, a witness, states that on the 3d December, 1851, he sold to Filley & Chapin one hundred and sixty dozen sheep skins, and deposited with them one hundred and eighty two dozen. He returned home and shortly after one of the Chapins called on him at his residence and wanted him to assist in procuring the discount of a note for six hundred dollars. He also wanted to purchase white sole leather. Witness went with him to a large leather dealer, but he would not sell to him on the terms offered. Nor could the witness procure a discount of the note. Witness went to Cincinnati about Christmas. Made application for the skins he had deposited. Cole was then in possession of the property and refused to give up the sheep skins. Filley, Burton and Earl, the witness says, made an estimate of the property on hand, which amounted to eight thousand five hundred dollars. Chaney, the brother-in-law of Chapin, purchased the stock on hand, and carried on the business, to some extent, in which Filley & Chapin had been engaged. Witness told the Chapins, that the number of sheep skins stated had never been shipped. The witness received letters from Filley & Chapin requesting him to send them sheep skins. When he sold to

the firm one hundred and sixty dozen sheep skins, and deposited the one hundred and eighty-two dozen, the firm gave him a note for his accommodation, to be secured by the skins deposited. The Chapins informed the witness that they had not purchased fifty dozen of sheep skins except from him. In the year 1849–50, witness purchased twenty-nine hundred dozen of sheep skins. In the year 1850 he sent to New Orleans fifty hundred dozen.

Mr. Taylor, a witness, is the largest manufacturer of leather in the city of Cincinnati. The white sole leather is more valuable than the red. In the winter of 1851–2 white sole leather was scarce and in demand. Had no idea that there was in the city two hundred rolls. He also deals in sheep skins, and had no knowledge of sixteen hundred dozen being in the city. Several other witnesses were acquainted with Filley & Chapin, had been in their stores and manufactory, and had seen little or no white sole leather, and not many bales of sheep skins.

Benjamin Earl, a witness for the defendants, was salesman for Filley & Chapin, up to the time of the sale to Cole. Burton never went with witness through the rooms of the boot and shoe factory, or of the stores. If he passed through the rooms it must have been after the shipment. The firm had rising of twelve hundred sides of leather in 1851. They dealt largely in sheep skins. Soon after Cole took possession, great quantities of sole leather, white and red, were purchased. The largest purchase made at once, within his recollection, was fifty rolls. The firm of Filley & Chapin employed from one hundred and fifty to one hundred and seventy-five hands. The witness prepared the articles for shipment, and he says that he forwarded to the Martha Washington, on drays, two hundred rolls of white sole leather, and sixteen hundred dozen of sheep skins, shipped to New York in the name of Kimball. The witness thinks that this shipment to New York, and the sale to Cole, were designed to place the property of Filley & Chapin beyond the reach of their creditors; they having failed in business. The witness shipped on board the Martha Washington about one hundred and fifty pairs of Hungarian boots for Kissane. The witness also states that he shipped to Horace Cole, in California, at the instance of Lyman Cole, fifty cases of boots and shoes; ninety odd cases he shipped to Cooley; on Red river. Two hundred boxes of boots were shipped from the factory by Adams Chapin. To Stephens, of Brownsville, in Texas, Cole shipped a variety of hats, shoes, &c., about seventy cases. These shipments were all made under the superintendence of the witness, who saw the boxes and other articles, a part of which he marked. He did not see the articles delivered on board the Martha Washington, but he has no doubt they were delivered, from the dray tickets which were returned to him. He says that

the white sole leather was principally deposited in the cellar under the store, which was dark, and could only be seen by candle light. It was piled up, about five rolls deep, against the wall, on the left hand in entering the cellar, and extended some thirty feet or more. Other rolls were in the factory, and other places. A great number of bales of sheep skins were in the same cellar. Other bales were in the factory building. The witness states that from seventy-five to near one hundred cases of boots were made in the factory weekly, each case containing one dozen pairs. The largest number that was made and sent to the store in one week, amounted to ninety-eight cases. Earl having borrowed twelve hundred dollars of Kissane, for Filley & Chapin, he assigned to Kissane in full payment, fifteen hundred dollars on the Madison insurance, which Adams Chapin had assigned to him for that purpose. This witness has been impeached by the testimony of Dr. Kates, who says he has been for several years acquainted with Earl. His intercourse with the family of the witness was almost daily. Several times the witness loaned money to Earl, on his responsibility, for the benefit, as witness supposed, of Filley & Chapin. Witness wanted the money and requested Earl to pay it. He complained that Filley & Chapin owed him at the time of the failure $————. He said he could send the Chapins to the penitentiary, and would do so if they did not pay him. Dr. Kates also says that Earl informed him that he had put a case or cases of articles that were worth little, and forwarded them to Texas, &c. On his examination in chief, Earl being questioned as regards this conversation with Dr. Kates, says that if he stated that he could send the Chapins to the penitentiary, he was under excitement, and spoke with reference to the conveyance of their property to defeat the claims of their creditors. He stated that he was disappointed in not being able to go eastward, on a matrimonial engagement, which, for want of funds, he was obliged to postpone. In regard to the case or cases of articles sent to Texas, he referred to the articles being unfashionable in Cincinnati, and consequently unsaleable. They consisted of Hungarian boots and low quartered shoes for ladies, which were not worn in Cincinnati, but which were good articles and saleable in Texas. Dr. Kates, on being asked by a juror, what was the character of Earl, answered it was good—that he had never told him a lie.

Robert Lemon was employed by Filley & Chapin as foreman in the factory. The usual quantity of sides of sole leather was from one thousand to three thousand sides, kept in the second and third stories of the building. At the stores such leather was kept in the cellar. They had the largest stock the witness ever saw. He prepared for shipment two hundred cases of boots, each case containing a dozen pairs. After the shipment there was but a

small amount of stock left. Cole's purchase was made about the middle of December.

Smith & Kissane claim to have shipped on board the Martha Washington twelve hundred boxes of candles, three hundred barrels of pork, one hundred and fifty-five cases of California boots, ten hundred and forty-nine gallons of brandy, and two hundred barrels of lard oil. Witnesses have been examined to prove that these articles were shipped on the Martha Washington. Mr. Cliff says that he hauled, with several other draymen, for Smith & Kissane, candle boxes and barrels of lard. He was engaged, as he thinks, four days. He believes twelve hundred boxes of candles were hauled to the above steamboat on and before the 7th of January, 1852. He also states six casks of brandy were hauled to the boat, at another time six casks, and one another, making thirteen casks.

F. Kilguss was also engaged in the above service as drayman—he hauled one cask of brandy to the boat. Also, he hauled thirty-three boxes of candles for Smith & Kissane. He also hauled from the pork house lard oil; from the factory candle boxes—there were three or four other drays engaged at the same time.

John Arnet, a drayman, says there were shipped from one thousand to twelve hundred boxes of candles, four or five barrels of lard, two hundred barrels of lard oil to the steamboat. Several other draymen corroborate the above statements. Thomas Anderson, a drayman, who did the hauling for Smith & Kissane, employed other drays when his own could not do the work required. He states that from the candle factory of Smith & Kissane, twelve hundred boxes of candles were hauled to the Martha Washington. Also, two hundred barrels of lard oil. From the steam house two hundred barrels and tierces of lard, one hundred of which were shipped by Cole to Lee, Boston; and one hundred to Taber, New Bedford. Two hundred and fifty barrels of pork belonging to Cole, and in addition, three hundred barrels of pork which the draymen were directed to take to the Statesman boat, but as that boat could not receive them, its cargo being completed, they were taken to the Martha Washington. He also states that fourteen casks of brandy were hauled for Smith & Kissane from Ward's, a liquor dealer, to the Martha Washington. He saw the above articles on the wharf opposite the Martha Washington, and hands were engaged loading them. This was in the evening. The above articles are similar to those claimed by Smith & Kissane to have been shipped on board the Martha Washington. And also two hundred and fifty barrels of pork, included in the shipment of Cole. Also, one hundred tierces of lard, and about one hundred and fifty cases of Hungarian boots, and six boxes of cigars. This, with the evidence before given, purports to cover the entire shipments of Cole and Kissane, also of Kim-

ball and Adams Chapin. And about seventy cases of shoes and boots to Stephens, thirteen barrels of brandy were sold by Cotteral, a witness, to Stephens, in exchange for stoves. This leaves six boxes of merchandize unaccounted for, which were said to contain ladies' cloaks, but there is no evidence where they were purchased, or as to their value.

Nicholson's insurance covered his liquors for the use of the bar and two boxes of merchandise. The bar is stated to have been well supplied with liquors. Of what the two boxes of merchandise consisted no account is given. Chandler's shipment consisted of two boxes of merchandise, but the contents of the boxes are not known. Chandler was discharged by the commissioner, but he was included in the indictment. Neither Chandler, Nicholson nor Stephens are before the court, and it may be owing to that circumstance that the articles shipped by them, or at least a part of them, are not in evidence.

Mr. Powers, a witness, states that after his return from California, in the summer of 1851, he recommended Kissane to ship to California Hungarian boots, and other articles, to Perkins & Engard, who were personally known to Kissane. Boots, the witness said, were selling there at $48 a pair.

The shipments made below Louisville are important only in regard to the capacity of the boat to carry the amount of freight stated. It appears that insurances were effected on the above shipments—by Stephens for $10,702 04; by Capt. Cummings on the boat $4,500, and to cover freight $2,500, making the sum of $7,000; by Kimball, $10,000; by Lyman Cole, $5,458; by Kissane, $8,000; by Chapin, $4,200; by Nicholson, $1,200. If these insurances were made on false invoices or bills of lading, it would afford conclusive evidence that the intention was to injure the underwriters. And it would authorize a presumption against the defendants, that they had done any thing necessary to be done to effectuate their object. And if the insurance was greatly beyond the probable value of the articles shipped, at the place of consignment, it would be ground on which the fairness of the transaction might well be questioned.

By the bills of lading, and other evidence, does it appear that there was a greater amount of tonnage on the boat than its capacity could carry? This is assumed as proved by the prosecution, and on this ground it is contended that there was fraud in the shipment. Witnesses differ as to the amount of tonnage the Martha Washington could carry. Mr. Powers, by measurement, ascertained that the cargo amounted to seven hundred and twenty tons. And it appears from the mathematical calculation of Mr. Matthews, that the Martha Washington could carry, in addition to that amount of freight, more than thirty tons. When the Martha Washington left the wharf at Cincinnati, the tops of her guards were from six to eight inches above the water line.

After her freight was all on board, the water, as some of the witnesses state, was over her railing at midships. It will be for you, gentlemen, to consider and determine, from the evidence, the fact as to the amount of freight.

It will be for you to determine, gentlemen, whether the Martha Washington was burnt accidentally or by design. This is a most important inquiry in the case. As before remarked, the burning is not necessary to establish the conspiracy charged, but if the fact be proved, that it was burnt by design, and by one of the defendants in this case, or by one clearly shown to be concerned in the incipient stages of the transaction, it will be very strong, and perhaps, conclusive evidence to establish the conspiracy charged. If the shipment was bona fide, yet if the conspiracy was to burn the boat, with the view to charge the underwriters, the defendants are guilty. The offence charged is of the highest criminality. It not only tends to destroy all confidence in commercial transactions, but in carrying out the intention, it must often involve the destruction of human life.

Lewis Choate was pilot of the Martha Washington. He was on watch at the time the fire occurred. The boat had wooded a short time before, and while thus engaged, the evening being intensely cold, he was in the social hall warming himself; he resumed his place as soon as the boat was ready to move. Capt. Cummings came up, stood in front of the pilothouse, but soon turned and came into the pilothouse. After running five or six miles the witness smelt paint burning, and so stated to Capt. Cummings, who ran down fronting the pilot-house, looking over, said the witness was mistaken. Witness said he was not mistaken. Capt. Cummings then ran down to the cabin deck. Holland, the mate, was on the hurricane deck, said the wood was very dry, and that he would go down. Witness then rang the bell violently, and stamped. In a very short time after smelling the fire, a minute or two, the smoke appeared, and fire. Heard no noise in the social hall. Nicholson, the clerk, said that he was sitting in the hall, his boots off, asleep. Did not know of the fire till witness gave the alarm. When he awakened the passengers, the fire was bursting some of the windows. The boat was about 300 yards from the shore when witness first saw the flames. He thinks no effort could have extinguished the fire. The boat was thrown to the land by the action of the starboard wheel in a few moments, and the passengers on deck jumped to the shore. One of them fell in the water. Capt. Cummings pulled off his coat and gave it to him. He and the mate were seen in the yawl at the boat, aft the wheel, where a passenger was standing on the guard, the fire around him. He was forced into the yawl, which moved toward the stern of the boat, when Capt. Cummings and the mate were seen on the guard, endeavoring to ascend into the ladies' cabin. Holland, with the aid of Cummings, got on the upper deck, and was forcing open the doors of the ladies' cabin. The smoke and fire filled the cabin. The yawl, shortly after it was left by the captain and mate, pushed off. The two persons in it, from excitement or alarm, could not manage it; and it floated down the river. The boat not being fastened at the bow, floated a considerable distance from the shore. Such was the progress of the flames, that the mate and captain must have been destroyed in a few minutes, if a skiff, which belonged to a flat boat, had not taken them from the burning wreck. The captain was often besought by persons on the shore to get into the skiff and save himself, but he seemed to be so determined to rescue some children on board, that he paid no attention to his personal safety, until the fire forced him to get into the skiff. So intensely cold was the weather, that no one could swim more than a few feet. When the captain came to the shore he was frenzied by excitement and was constantly raising his hands and exclaiming, "O! Lord! Where are the children?" The fire was first seen in the social hall, on the larboard side, opposite the chimney. There was there deposited a number of candle-boxes, and on them bundles of brown paper, and on them bundles of brooms were laid. Opposite the chimney there was the appearance of a door, the upper part of which was made of painted Venetian blinds. The cabin of the Martha Washington was taken from the Era. It was old, and had been frequently painted. Around the chimney there was a case of tin or sheet-iron to prevent the heat of the chimney from setting the boat on fire. Several of the witnesses say, that the boat was liable to take fire from the larboard chimney. That on its trip up the river a short time before, it had taken fire from the chimney three times in one day. One of the witnesses, who had been employed on board of the boat, had known her to be on fire nearly fifty times. Another witness says when he saw the fire first, the flames were seen in the slats of the false door. Nicholson, from his own confession, was in the social hall when the fire broke out, asleep, and was wakened by the bell. Seeing the fire, he awakened the passengers.

As to the burning of the boat there is no positive evidence; and in such a case, unless circumstances raised a probability of guilt, the jury may well inquire into the motive of Nicholson or of some other individual, to do the act. Admit that he owned half the boat, and had an insurance that would cover the liquors in his bar, and two boxes of merchandise, still his interest would not lead him to burn the boat. It was insured for only one-half of the sum paid for it, so that his loss would greatly exceed the amount of his insurance. Men are seldom, if ever, prompted to commit a crime, except from motives of gain or revenge.

There are a great many circumstances connected with this case, which have been brought to bear upon it, and which may

have no direct relation to its merits. The clerk of Kissane, who now states that he swore, without objection on his part, to a bill of lading, not knowing that the articles had been shipped, affords no evidence of intentional fraud, if the proof be clear that the articles were shipped. The copy of a letter of Kissane, charged to have been taken surreptitiously from the papers of the district attorney, is in evidence. Some testimony has been given as to the abstraction of that letter, but as the act of taking it as charged is an indictable offense, you cannot in this case convict him of the act. The court permitted the evidence to show the motive, with which the letter must have been taken. There can be no doubt, from the history of this case, the defendants were acquainted with each other, and that in the purchase of the boat, and in the shipment of the cargo from Cincinnati, they were engaged in the commercial enterprise. Their shipments were made, as appears, not for the benefit of the whole, but for the benefit of the shippers individually, as stated in the bills of lading. But, notwithstanding this individuality of ownership, if they united in a conspiracy to burn the boat, in order to charge the underwriters, they are guilty under the act of congress. But in this, as in all other cases, guilt cannot be inferred by vague surmises arising from acts which had not a direct tendency to form the conspiracy or carry it out. If the jury shall be satisfied from the evidence that shipments were made according to the bills of lading and invoices furnished, the injury to the underwriters can only arise from the conspiracy to burn the boat.

It is the province of the jury, and not of the court, to decide on the credibility of witnesses. Earl, who is the principal witness, so far as the Chapins and Cole are concerned, is a man, as the jury must have perceived, of intelligence. He being the salesman of the house of Filley & Chapin, had a much better opportunity of knowing the facts stated by him than any other witness. He is unimpeached, except by Dr. Kates, which is explained by Earl in his evidence in chief. Mr. Burton and he differ in the fact, that an estimate was made of the stock on hand by them and another individual. The discrepancy between these witnesses may be explained without an impeachment of either, if the principal view of the stock by Mr. Burton was after the shipment, or if he did not enter the dark cellar, where the white sole leather, as stated by Earl, was stored. Mr. Kepler, a witness, says, that Burton came to Cincinnati on the 5th of January, the day after the shipment was made.

You will examine, gentlemen, and weigh the evidence, and decide this great case, under the law, as your judgment shall sanction. I know of no higher function which a citizen can be called to discharge, than to sit in judgment on his fellow-creatures. It should remind us all of that day when we shall be judged. In the discharge of a duty so awful, how careful should we be to examine ourselves and see that no lurking prepossession or prejudice should influence our judgment. We know the case only as it has appeared to us on this trial. Whatever may have been said in regard to it elsewhere, is unfit to be considered here. Even those sympathies so honorable to our natures, are not to influence us here. Nothing but the facts and the law, should govern you. You will not convict, if you have reasonable doubts. But if such doubts have no place in your judgment, your verdict will be against the defendants, or such of them as you may find guilty.

The jury, before they retired, requested to have, in their retirement, the charge of the court. The counsel having no objection, the court handed the charge to the jury, but afterward withdrew it, that it might be printed for the use of the jury. The printed copy, corrected by the judge, was handed to the jury the same evening.

The jury, after being absent a considerable time, including the Sabbath, returned into court, with a verdict of not guilty.